Slip Op. 16-95

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ABB INC.,<br><br>          Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>          Defendant,<br><br>HYUNDAI HEAVY INDUSTRIES CO. LTD., HYUNDAI CORPORATION USA, HYOSUNG CORPORATION, and HICO AMERICA SALES AND TECHNOLOGY, INC.,<br><br>          Defendant-Intervenors. | Before: Mark A. Barnett, Judge<br><br>Court No. 15-00108<br><br>**PUBLIC VERSION** |

## OPINION AND ORDER

[Plaintiff's motion is granted, in part, and the determination is remanded to the Department of Commerce]

Dated: October 7, 2016

*R. Alan Luberda*, Kelley Drye & Warren LLP, of Washington, DC, argued for plaintiff. With him on the brief were *David C. Smith, Jr.* and *Joshua R. Morey*.

*John J. Todor*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director.  Of Counsel on the brief was *James H. Ahrens, II,* Attorney, U.S. Department of Commerce, Office of Chief Counsel for Trade Enforcement and Compliance, of Washington, DC.

*David E. Bond*, White & Case, LLP, of Washington, D.C., argued for defendant-intervenor Hyundai Heavy Industries, Co., Ltd. and Hyundai Corporation USA.  With him on the brief were *Walter J. Spak*, *William J. Moran* and *Ron Kendler*.

*Henry D. Almond*, Arnold & Porter LLP, of Washington, D.C., argued for defendant-intervenors Hyosung Corporation and HICO America Sales and Technology, Inc.  With him on the brief were *J. David Park*, *Andrew M. Treaster* and *Yujin K. McNamara*.

Barnett, Judge:  In this action ABB, Inc. ("Plaintiff" or "ABB") challenges the final results of the U.S. Department of Commerce ("Commerce") in its first administrative review of the antidumping duty order on large power transformers ("LPTs") from the Republic of Korea for the February 16, 2012 to July 31, 2013 period of review ("POR"). *Large Power Transformers from the Republic of Korea*, 80 Fed. Reg. 17,034 (Dep't Commerce Mar. 31, 2015) (final results of antidumping duty administrative review; 2012-2013) ("*Final Results*"), Public Joint App. ("PJA"), Doc. 1, ECF No. 72; Confidential Joint App. ("CJA"), Doc. 1; Public Admin. R. ("P.R.") 276, ECF No. 26-9;[1] and accompanying *Issues and Decision Mem.*, A-580-867 (Mar. 23, 2015) ("*I&D Mem.*"), CJA, Doc. 2; PJA, Doc. 2; P.R. 261;[2] *Large Power Transformers from the*

---

[1] The administrative record is divided into a Public Administrative Record ("P.R."), ECF No. 26-9, and a Confidential Administrative Record ("C.R."), ECF No. 26-8.  Parties submitted joint appendices containing all record documents cited in their briefs.  *See* Public Joint App. ("PJA"), ECF No. 72, and Confidential Joint App. ("CJA"), ECF No. 71.  Additionally, the Court requested complete versions of certain record documents for which parties had only submitted selected pages in the joint appendices.  These are cited separately as they appear in this opinion.

[2] *See also* Proprietary Arguments from the Issues and Decision Mem. of the Admin. Review of the Antidumping Duty Order on Large Power Transformers from the Republic of Korea; 2012-2013: Hyundai Heavy Industries (HHI) and Hyundai Corp. U.S.A. (Hyundai USA) (collectively, Hyundai) (Dep't Commerce Mar. 23, 2015) ("*Proprietary I&D Mem. - Hyundai*"), CJA, Doc. 36; PJA, Doc. 36; C.R. 546; P.R. 270; Proprietary Arguments from the Issues and Decision Mem. for the Final results of the Antidumping Duty Admin. Review of Large Power Transformers (LPTs) from the Republic of Korea (Korea): – Hyosung Corp. (Hyosung) (Dep't Commerce Mar. 23, 2015) ("*Proprietary I&D Mem. - Hyosung*"), CJA, Doc. 37; PJA, Doc. 37; C.R. 525; P.R. 263.

*Republic of Korea*, 80 Fed. Reg. 26,001 (Dep't Commerce May 6, 2015) (amended final results of antidumping duty admin. review; 2012-2013) ("*First Am. Final Results*"), CJA, Doc. 3; PJA, Doc. 3; P.R. 291, and accompanying Am. Final Results of the Antidumping Duty Admin. Review of Large Power Transformers from the Republic of Korea; 2012-2013: Allegations of Ministerial Errors (Dep't Commerce Apr. 28, 2015) ("*First Am. Final Results Mem.*"), CJA, Doc. 42; PJA, Doc. 42; P.R. 284; *Large Power Transformers from the Republic of Korea*, 80 Fed. Reg. 35,628 (Dep't Commerce June 22, 2015) (second amended final results of antidumping duty administrative review; 2012-2013) ("*Sec. Am. Final Results*"), CJA, Doc. 4; PJA, Doc. 4; P.R. 304, and accompanying Second Am. Final Results of the Antidumping Duty Admin. Review of Large Power Transformers from the Republic of Korea; 2012-2013: Allegations of Ministerial Error (Dep't Commerce June 15, 2015) ("*Sec. Am. Final Results Mem.*"), CJA, Doc. 44; PJA, Doc. 44; P.R. 294.  Plaintiff argues that the final dumping margins assigned to Defendant-Intervenors, Hyundai Heavy Industries Co., Ltd. ("HHI") and Hyundai Corp., USA (collectively, "Hyundai"), and Hyosung Corp. and HICO America Sales and Technology, Inc. (collectively, "Hyosung") are based on data that were unreliable and are therefore unsupported by substantial evidence and not in accordance with law.  *See generally* Conf. Pl.'s Mem. of Law in Supp. of Mot. for J. on the Agency R. ("Pl.'s MJAR."), ECF No. 45-1.  Plaintiff further argues that Commerce should have used facts available or "adverse facts available" to arrive at more accurate dumping margins for Hyosung and Hyundai.  *See id*. at 33, 39-42.  Finally, Plaintiff argues that Commerce should not have granted home market commission offsets to Hyosung and Hyundai and that its decision

to do so is unsupported by substantial evidence and not in accordance with law.  *Id*. at

47-52; *see also* Conf. Pl.'s Reply Br. ("Pl.'s Reply") at 18-22, ECF No. 69.  For the

reasons detailed below, the Court will sustain, in part, and remand, in part, Commerce's

Final Results.

BACKGROUND

The present case challenges the final results of Commerce's first administrative

review of the antidumping duty order on large power transformers from the Republic of

Korea.  *See generally Final Results*; *see also Large Power Transformers from the*

*Republic of Korea*, 77 Fed. Reg. 53,177 (Dep't Commerce Aug. 31, 2012) (antidumping

duty order) ("*AD Order*").  The Court begins with a brief discussion of the original

investigation to the extent that it is relevant to the issues raised by Plaintiff in this case.

### I.    Original Investigation

On August 10, 2011, Commerce initiated an antidumping duty investigation on

large power transformers from Korea.  *Large Power Transformers from the Republic of*

*Korea*, 77 Fed. Reg. 9,204 (Dep't Commerce Feb. 16, 2012) (prelim. determination of

sales at less than fair value and postponement of final determination) ("*LTFV Prelim.*

*Notice*").  The period of investigation ("POI") was from July 1, 2010, through June 30,

2011.  *Large Power Transformers from the Republic of Korea,* 77 Fed. Reg. 40,857

(Dep't Commerce July 11, 2012) (final determination of sales at less than fair value)

("*LTFV Final Results"*), CJA, Doc. 5; PJA, Doc. 5 and accompanying *Issues and*

*Decision Mem.*, A-580-867 (July 2, 2012) ("*LTFV I&D Mem."*) at 2, CJA, Doc. 6; PJA,

Doc. 6.  Commerce selected Hyundai and Hyosung as mandatory respondents and

issued its final determination on July 11, 2012.  *LTFV Prelim. Notice,* 77 Fed. Reg. at

9,205; s*ee generally LTFV Final Results*.

 In the final determination for the less than fair value ("LTFV") investigation and

accompanying Issues and Decision Memo, Commerce addressed the issue of

"unshipped sales," explaining that when "the merchandise under consideration are

large, complex, capital intensive custom made products that take many months to

produce and install, the Department is often faced with the decision to balance the use

of actual costs in their entirety with maximizing the population of sales to use to

calculate a dumping margin."  *LTFV I&D Mem.* at 43-44, 61-62.  In the investigation,

Commerce extended the period for reporting actual costs incurred to six months beyond

the end of the POI.  *Id.* at 43.  However, in calculating the dumping margins, Commerce

used only POI sales that had been completed and shipped as of December 31, 2011,

and excluded from consideration those sales that were incomplete or unshipped as of

that date.  *Id.*  Commerce reasoned that, because the unfinished sales continued to be

produced, the relevant sales and cost data would continue to change.  *Id.*; *see also id.*

at 59 (Hyosung explained that customers may request additional services or cancel

previously requested services up until the time of delivery).

 ## II.    First Administrative Review

 On October 2, 2013, Commerce initiated the first administrative review for the

period February 16, 2012 through July 31, 2013.  *Initiation of Antidumping and*

*Countervailing Duty Admin. Reviews and Request for Revocation in Part*, 78 Fed. Reg.

60,834 (Dep't Commerce Oct. 2, 2013), CJA, Doc. 7; PJA, Doc. 7; P.R. 6.  ABB

requested the review, and Hyosung and Hyundai were again selected as mandatory respondents.  *I&D Mem.* at 3.

As part of the review, Commerce requested that both Hyosung and Hyundai report actual and/or updated data for all transactions that were shipped, sold and entered the United States during the POR, including "overlapping sales" that were reported based on estimated data during the investigation, but had shipped during the POR.  *Id.* at 14-16 (explaining the issue of "overlapping sales" with respect to Hyosung and noting Commerce's request for updated information for all "overlapping sales" shipping during POR); *see also id.* at 47 (explaining the issue of "overlapping sales" with respect to Hyundai); *see also LTFV I&D Mem.* at 42-44, 61-62.

On September 24, 2014, Commerce published the preliminary results of its review.  *Large Power Transformers from the Republic of Korea*, 79 Fed. Reg. 57,046 (Dep't Commerce Sept. 24, 2014) (prelim. results of antidumping duty admin. review; 2012-2013) ("*Prelim. Results*"), CJA, Doc. 27; PJA, Doc. 27; P.R. 217 and accompanying *Issues and Decision Mem.*, A-580-867 (Sept. 18, 2014) ("*Prelim. I&D Mem.*"), CJA, Doc. 62; PJA, Doc. 62; P.R. 208.[3]  On March 31, 2015, Commerce issued

---

[3] *See also* Analysis of Data Submitted by Hyosung Corp. in the Prelim. Results of the 2012-2013 Admin. Review of the Antidumping Duty Order on Large Power Transformers from the Republic of Korea (Dep't Commerce Sept. 18, 2014) ("*Prelim. Mem. - Hyosung*"), ECF No. 82-3; CJA, Doc. 26; PJA, Doc. 26; C.R. 423; P.R. 209 (proprietary prelim. mem. for Hyosung accompanying the prelim. results); Analysis of Data Submitted by Hyundai Heavy Indus. Co. Ltd., Corp. in the Prelim. Results of the 2012-2013 Admin. Review of the Antidumping Duty Order on Large Power Transformers from the Republic of Korea (Dep't Commerce Sept. 18, 2014) ("*Prelim. Mem. - Hyundai*"), ECF No. 82-4; CJA, Doc. 56; PJA, Doc. 56; C.R. 430; P.R. 211 (proprietary prelim. mem. for Hyundai accompanying the prelim. results).

the *Final Results*. *Final Results,* 80 Fed. Reg. at 17,034.   ABB timely filed the present

case on April 10, 2015.  *See generally* Summons, ECF No. 1; Compl., ECF No. 6.

Subsequently (and with leave from this Court), on May 6, 2015, Commerce issued the

First Amended Final Results and then, on June 22, 2015, the Second Amended Final

Results, both in response to allegations of ministerial error.  *See First Am. Final Results*,

80 Fed. Reg. 26,001; *Sec. Am. Final Results,* 80 Fed. Reg. at 35,628; Order, ECF No.

24 (June 3, 2015).[4]  The second amended final results assigned weighted average

dumping margins of 8.23 percent and 12.36 percent to Hyosung and Hyundai

respectively.  *See Sec. Am. Final Results*, 80 Fed. Reg. at 35,629.

JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to § 516A(a)(2)(B)(i) of the Tariff Act of 1930,

as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012),[5] and 28 U.S.C. § 1581(c) (2012).

The court will uphold an agency determination that is supported by substantial

evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

"Substantial evidence is 'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'"  *Huaiyin Foreign Trade Corp. (30) v. United States*,

322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB.*, 305 U.S.

197, 229 (1938)).  It "'requires more than a mere scintilla," but "less than the weight of

---

[4] The First Amended Final Results were published on May 6, 2015, prior to the issuance of this order, as a result of an inadvertent error by Defendant, United States.  *See* Def.'s Mot. for Leave, Out of Time, for the Dep't of Commerce to Consider Ministerial Error Allegations and, if Necessary, to Publish Am. Final Results, ECF No. 23 at 2-3.
[5] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, 2012 edition.

the evidence." *Nucor Corp. v. United States*, 34 CIT 70, 72, 675 F. Supp. 2d 1340,

1345 (2010) (quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004)).

In determining whether substantial evidence supports Commerce's determination, the

court must consider "the record as a whole, including evidence that supports as well as

evidence that 'fairly detracts from the substantiality of the evidence.'" *Nippon Steel*

*Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting *Atl. Sugar, Ltd. v.*

*United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).   However, the fact that a plaintiff

can point to evidence that detracts from the agency's conclusion or that there is a

possibility of drawing two inconsistent conclusions from the evidence does not preclude

the agency's finding from being supported by substantial evidence.  *Matsushita Elec.*

*Indus. Co. v. United States,* 750 F.2d 927, 933 (Fed. Cir. 1984) (citing *Consolo v. Fed.*

*Mar. Comm'n*, 383 U.S. 607, 619-20 (1966)).  The court may not "reweigh the evidence

or . . . reconsider questions of fact anew." *Downhole Pipe & Equip., L.P. v. United*

*States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015) (quoting *Trent Tube Div., Crucible*

*Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 815 (Fed. Cir. 1992)); *see*

*also Usinor v. United States*, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004)

(citation omitted) (the court "may not reweigh the evidence or substitute its own

judgment for that of the agency").

Separately, the two-step framework provided in *Chevron, U.S.A., Inc. v. Nat.*

*Res. Def. Council, Inc.*  467 U.S. 837, 842-45 (1984), guides judicial review of the

Department's interpretation of the antidumping and countervailing duty statutes.  *See*

*Nucor Corp. v. United States*, 414 F. 3d 1331, 1336 (Fed. Cir. 2005).  First, the Court

"must determine whether Congress has directly spoken to the precise question at issue." *Heino v. Shinseki*, 683 F.3d 1372, 1377 (Fed. Cir. 2012) (quoting *Chevron*, 467 U.S. at 842).  If Congress's intent is clear, "that is the end of the matter." *Id.* (quoting *Chevron*, 467 U.S. at 842-43).  However, "[i]f the statute is silent or ambiguous," the Court must determine "whether the agency's [action] is based on a permissible construction of the statute." *Dominion Res., Inc. v. United States*, 681 F.3d 1313, 1317 (Fed. Cir. 2012) (citing *Chevron*, 467 U.S. at 842-43).

## DISCUSSION

### I.    Hyosung's Final Margin Determination

ABB argues that Commerce's determination of Hyosung's final margin is unsupported by substantial evidence on the record because discrepancies exist between data that Hyosung provided to Commerce during the LTFV investigation and the first administrative review.  ABB argues that these and other discrepancies undermine the reliability of Hyosung's U.S. price and expense data and Commerce should have used facts available or facts available with an adverse inference ("adverse facts available" or "AFA")[6] to calculate Hyosung's dumping margin.  In support of this argument, ABB identifies a number of alleged discrepancies in Hyosung's data.  *See*

---

[6] 19 U.S.C. § 1677e(a) provides that Commerce may use "facts otherwise available" in reaching the applicable determination if necessary information is not on the record or an interested party withholds information that has been requested, fails to provide such information in a timely manner, significantly impedes the proceeding, or provides information that cannot be verified.  Subsection (b) further provides that Commerce may use an adverse inference in selecting from among the facts otherwise available if the interested party failed to cooperate by not acting to the best of its ability.  *See also* 19 C.F.R. § 351.308.

*generally* Pl.'s MJAR. at 14-36.  Defendant argues that Commerce confirmed the

accuracy of Hyosung's data by issuing multiple questionnaires and reviewing source

documentation, and that the difference in data between the LFTV investigation and the

first administrative review is attributable to Hyosung having provided estimated data

during the LTFV investigation and actual data during the review.  *See generally* Conf.

Def.'s Resp. to Pl.'s Rule 56.2 Mot. for J. on the Agency R. ("Def.'s Resp."), ECF No. 61

at 12-17.

### A.  The Reliability of Hyosung's U.S. Price and Expense Data

### i.  Discrepancies in Hyosung's Data for Overlapping Sales

ABB contends that "Commerce relied on inconsistent and inaccurate data"

submitted by Hyosung that artificially increased reported U.S. prices in the underlying

[first administrative review] from those verified for the same sales reported in the

immediately preceding original investigation" and that Commerce failed to "adequately

address this detracting information in the Final Results."  Pl.'s MJAR at 14 (underline

omitted).  ABB's claims rest on allegations of discrepancies in price and expense data

reported for U.S. sales that were unshipped during the original investigation and that

entered the United States during the first administrative review (referred to as

"overlapping sales").  *Id*.  Defendant notes that Commerce issued multiple

questionnaires in response to ABB raising this concern during the administrative

proceeding and reasonably determined that the data was sound.  Def.'s Resp. at 12-13.

The Court reviews Commerce's determination for substantial evidence on the record.  In response to ABB's concern regarding the discrepancies between the estimated and actual data, Hyosung responded to multiple supplemental questionnaires, providing information to permit Commerce to evaluate the reliability of Hyosung's data.  *I&D Mem.* at 16-17; *see e.g.* Hyosung's Apr. 10, 2014, Supplemental Section A-C Questionnaire Response ("Hyosung Apr. 10 SQR") at 23-24, ECF Nos. 82-9 – 82-14; C.R. 255-260; P.R. 125-126; Hyosung's July 2, 2014, Supplemental Section A-C Questionnaire Response ("Hyosung July 2 SQR") at S-18 – S-22, ECF No. 82-26; C.R. 308-14; P.R. 160-61.  Commerce determined that Hyosung persuasively demonstrated the completeness and accuracy of its reported sales by providing source documentation such as "sales contracts/purchase orders, amended purchase orders, invoices, payment records, and numerous other documents" and that "[ABB's] analyses are misplaced and simply incorrect in each instance."  *I&D Mem.* at 16.  Commerce also concluded that ABB's claims regarding the changes in data for the overlapping sales "can be attributed to either Petitioner's own misrepresentation of record evidence[,] or (1) the reporting of estimated values . . . , (2) consideration of amended or revised purchase orders issued by the U.S. customer, or (3) expanded scope of services requested by the U.S. customer for the sale . . ."  *Id.* at 16.

The Court has reviewed the record evidence showing that Commerce requested documents and information, and Hyosung complied with these requests in order to address questions about its data.  The Court finds that Commerce's conclusion that Hyosung's data was reliable is supported by substantial evidence on the record.  *I&D*

*Mem.* at 16 n. 77 (noting multiple questionnaire responses from Hyosung).  It logically follows from the circumstances surrounding the "overlapping sales" that the estimates reported during the LFTV investigation could and would differ from the actual costs reported during the administrative review, and both Commerce and Hyosung had anticipated this.[7]  Moreover, the critical question for this administrative review is whether Hyosung adequately substantiated the data it is now reporting.  As detailed in the Issues and Decision Memo, Commerce reviewed numerous documents, including contracts, purchase orders, invoices and amended invoices, and payment records to confirm Hyosung's data and reasonably found that it was accurate as reported.  *I&D Mem.* at 16.

 ABB also raised certain specific issues regarding Hyosung's data and the Court will now address those in turn.

- **ABB's First Selected Transaction**

 To illustrate its claim that there were discrepancies in the data supplied by Hyosung, ABB alleges that Hyosung reported an increase in gross unit price for a selected transaction at the same time as it reported a decrease in the actual cost of

---

[7] During the LFTV Investigation Commerce had "instructed Hyosung to report sales and expense data for POI sales that may not have shipped as of December 31, 2011" even if actual costs and expenses had yet to be finalized.  *I&D Mem.* at 15.  At that time, Hyosung indicated that variations would exist between the estimated and actual data, and Commerce "understood[] [that] the estimated data and initial gross-unit prices reported for its unshipped sales would need to be updated to reflect actual data for when these sales shipped during the first administrative review."  *Id.* at 15.  As expected, the data Hyosung submitted for the first administrative review "differed from the data in the LFTV investigation in certain instances."  *Id.* at 15-16.

producing the unit.[8]  Pl.'s MJAR at 19.  ABB argues that there is insufficient evidence in the record to support Hyosung's explanations for these changes.[9]  *Id.* at 21.  Defendant contends that Commerce examined this allegation during the review and that Hyosung addressed it in its Fourth Supplemental Sales Questionnaire Response (Aug. 21, 2014). Def.'s Resp. at 15 (citing Hyosung's August 21, 2014, Fourth Supplemental Sales Questionnaire Response ("Hyosung Aug. 21 SQR"), CJA, Doc. 22; PJA, Doc. 22; C.R. 367-370; P.R. 194).  In that response, Hyosung explained that it had provided an estimated cost to the customer based on revised customer requirements.  *Id.*; *see also* Hyosung Aug. 21 SQR at 11.  The customer accepted this estimate.  *Id.*; *see also* Hyosung Aug. 21 SQR at 11.  Subsequently, Hyosung's design team developed a more efficient unit and Hyosung experienced a decline in raw material costs.  *Id.*; *see also* Hyosung Aug. 21 SQR at 15-16.  As such, Hyosung was able to produce the unit at a lower cost, even though the customer had accepted a higher price.  *Id*; *see also* Hyosung Aug. 21 SQR at 10-16.  Commerce found that Hyosung had sufficiently demonstrated that changes in data between the original investigation and the first administrative review were attributable to the reporting of estimated versus actual values and amended or revised purchase orders.  *I&D Mem.* at 16 & n. 77.

---

[8] This transaction was identified in Hyosung's database as SEQU [[  ]].  Pl.'s MJAR at 19.

[9] ABB specifically takes issue with Hyosung's claims that the change in price is attributable to [[

                                          ]].  Pl.'s MJAR at 19-22; Pl.'s Reply at 3-5.

The Court finds that substantial evidence supports Commerce's reliance on Hyosung's reported price and costs for this transaction.  *See, e.g.,* Hyosung Aug. 21 SQR at 10-16.  Hyosung responded to every request issued by Commerce regarding this sale, and supplied data and supporting documentation for its responses.  *See I&D Mem.* at 17.  While ABB claims that it was unable to locate a specific document (a test sheet) that should have further confirmed the size and weight of the final product, ABB was not able to identify where or when Commerce requested this particular document. The absence of this unrequested document is contrasted by the record as a whole and the remainder of the documentation and explanations provided by Hyosung to Commerce during the course of the administrative review.  Therefore, the Court declines to reweigh the evidence upon which Commerce relied.  *See Downhole Pipe & Equip.,* 776 F.3d at 1377; *see also Usinor*, 28 CIT at 1111, 342 F. Supp. 2d at 1272.  In view of the record as a whole and Commerce's investigation of ABB's allegation, the Court finds that Commerce's determination with respect to this transaction is based on substantial evidence.

### ii.  Hyosung's Gross Unit Price (GUP) Relative to Reported Expenses

ABB argues that there is conflicting data on the record regarding Hyosung's reported expenses and gross unit prices.  ABB alleges that there are discrepancies in Hyundai's reported freight expenses that result in improperly marked-up freight revenues beyond actual costs and consequently, inflated U.S. prices.  *See* Pl.'s MJAR

at 23-24.  ABB identifies a second selected transaction to illustrate its point.[10]  *Id.* 22-24.

ABB argues that Commerce should have addressed this by capping freight revenue at

actual cost.  *Id.* at 24.  Additionally, ABB contrasts certain expense amounts reported to

Commerce with different expense amounts reported for other reasons[11] to suggest that

either the expenses reported to Commerce are understated or the prices are

overstated.  *Id.* at 30-31.  For each allegation raised, the Court finds that Commerce

requested and reviewed directly relevant source documentation substantiating

Hyosung's reported data, found Hyosung's data to be reliable, and made its

determination based on substantial evidence in the record.

### a.  Hyosung's Freight Expense Data

ABB asserts that Hyosung increased the price for a second selected transaction

based on a claim for increased freight expenses, which included a mark-up beyond the

actual freight expense (*i.e.*, profit).  Pl.'s MJAR at 23.  ABB contends that, as a result,

"Commerce's net price calculations are consistently overstated," *id.* at 24, and that

Commerce should have capped Hyosung's freight revenue at the amount of the actual

expense.  *Id.* at 24, 30-34 (arguing that Commerce has a policy of capping revenues

included in gross unit price at the level of expenses actually incurred, as evidenced in

*Certain Pasta from Italy,* 78 Fed. Reg. 48,146 (Dep't. Commerce Aug 7, 2013) (prelim.

results of antidumping duty admin. review; 2011-2012) and Prelim. Results in the

---

[10] This second selected transaction is identified in Hyosung's sales database as SEQU
[[  ]].  Pl.'s MJAR at 22.
[11] Reported to [[   ]] or in Hyosung's [[                                                ]].  *See* Pl.'s MJAR at 30-
31.

2011/2012 Admin. Review on Certain Pasta from Italy: Sales Analysis Mem. for the

Prelim. Results – the Rummo Group (Dep't Commerce July, 30, 2013), ECF No. 81).

Defendant responds that ABB mistakenly assumed freight revenue was allocated

evenly across several units the sales of which were reported separately in Hyosung's

database when, in fact, Hyosung correctly had allocated a greater amount of revenue to

one of the units.[12]  Def.'s Resp. at 17-18; *see also* Hyosung's Aug. 25, 2014 Fourth

Supplemental Sales Questionnaire Response ("Hyosung Aug. 25 SQR"), Ex. S-1 at

JA101825, CJA, Doc. 23; PJA, Doc. 23; C.R. 371-73; P.R. 195-96 (revised U.S. sales

database).  The freight revenue was not allocated evenly across units but, rather, it was

allocated as it was incurred – with units shipped in multiples receiving a different per

unit allocation of the freight expense.  *See id.* (revised U.S. sales database noting ship

dates and freight expenses for the relevant units).  Defendant also explains that the

"revenue figures used by ABB are not the reported data used in calculating [Hyosung's]

dumping margin," and that "ABB's analysis does not demonstrate that Hyosung's

reported gross unit prices are artificially inflated."  Def.'s Resp. at 18.

---

[12] Defendant also argues that ABB does not use Hyosung's reported revenue in its
analysis, but rather, relies on a mistaken estimate of the freight revenue that Hyosung
provided in one of its questionnaire responses.  Def.'s Resp. at 17-18.  Further, ABB
used a date-of-sale exchange rate to convert Hyosung's reported figure to U.S. dollars,
when the data Hyosung reported to Commerce was itself a converted figured because
the freight provider had billed Hyosung in U.S. dollars and Hyosung had not been
requested to provide (nor had it provided) the exchange rate it had used to convert the
figure into Korean currency before reporting it to Commerce.  *Id.*  Thus, ABB's
exchange rate adjustments based were upon faulty assumptions.

        The Court first notes that Commerce identified this second selected transaction

as one of the overlapping sales for which it gathered actual data during the POR (and

for which Commerce had originally received estimated data during the LTFV

investigation).  *See I&D Mem.* at 34; *see also* Hyosung July 2 SQR at S-20 – S-21,

CJA, Doc. 18; PJA, Doc. 18.[13]  As with other overlapping sales, Commerce explained

that both the agency and Hyosung had anticipated changes in data from the LTFV

investigation to the instant review, *I&D Mem.* at 35, and the Court has already

addressed this argument above, *see supra* Discussion Section I.A.i.  Moreover, with

respect to the change in price for the second selected transaction, Commerce

requested and received explanations and corresponding documentation from Hyosung.

*See* Hyosung July 2 SQR at S-20 – S-21, CJA, Doc. 18; PJA, Doc. 18; *see also*

Hyosung July 2 SQR at Ex. S-11, CJA, Doc. 60; PJA, Doc. 60.  Commerce accepted

Hyosung's explanation that the data changed because "subsequent to the original

purchase order, the U.S. customer requested changes to the original purchase order

(*e.g.*, an expanded scope of services)," and that this "understandably resulted in an

increase to the build-up of the total reported gross unit price for this transaction."  *I&D*

*Mem.* at 35.  Hyosung supported its explanation for the price change with

documentation, including revised purchase orders and HICO America's invoice to the

U.S. customer.  *Id.; see also* Hyosung July 2 SQR at S-20 – S-21, CJA, Doc. 18; PJA,

---

[13] Parties filed multiple excerpts from the Hyosung July 2 SQR in the CJA and PJA (as well as in separate docket filings as ECF Nos. 82-22 – 82-24, 82-26 – 82-28). Accordingly, where the Court short cites to the Hyosung July 2 SQR it will continue to include the relevant ECF or CJA/PJA numbers.

Doc. 18; *see also* Hyosung July 2 SQR at Ex. S-11, CJA, Doc. 60; PJA, Doc. 60. In light

of the Court's previous analysis of the overlapping sales issue, the documentation

contained in the record, and Commerce's determination that Hyosung provided

adequate supporting documentation on the final price and expenses of this second

selected transaction, the Court finds that Commerce's decision to accept the price and

expense data for this transaction is based on substantial evidence.

Responding to ABB's argument that Commerce should have capped Hyosung's

freight revenue at the amount of the actual expense, Hyosung argues that while

Commerce may have a policy of capping freight revenue, it would not apply in the case

at bar because, unlike in *Certain Pasta from Italy,* cited by Plaintiff, Commerce did not

request and Hyosung did not attempt to break out any freight or other charges included

in its gross unit price.  Conf. Hyosung's Resp. in Opp'n to Pl. ABB Inc.'s R. 56.2 Mot. for

J. on the Agency R. ("Hyosung Resp.") at 26, ECF No. 66; *Certain Pasta from Italy,* 78

Fed. Reg. 48,147.  Further, Hyosung argues that capping would be "inappropriate and

distortive" in this case because it "established its prices through negotiations with its

customers based on the particular terms of sale." Hyosung Resp. at 27.[14]   Hyosung

contends that capping was not warranted because the terms of sale included delivery

and freight was not separately contracted for with the customer.  *See id.* at 18-21, 25-

26.  The actual freight expenses were not stated in the purchase order because the

amount could not be determined until delivery occurred.  Hyosung Resp. at 18-19; *see*

---

[14]  The sale in question was finalized as "[[                                    ]]."  Hyosung July
3 SQR, Ex. S-11 at JA 400460, CJA, Doc. 60; PJA, Doc. 60.

*also* Hyosung July 2 SQR, Ex. S-11 at JA 400460, CJA, Doc. 60; PJA, Doc. 60.

Hyosung submitted its final invoice to Commerce documenting the expense at the time

of delivery.   Hyosung Resp. at 20; *see also* Hyosung July 2 SQR, Ex. S-11 at JA

400465-466, CJA, Doc. 60; PJA, Doc. 60.

Having reviewed the record compiled by Commerce, the Court finds that

Commerce's acceptance of the reported gross unit price and its use of the freight

expense was based on substantial evidence.   Commerce did not require Hyosung to

report separately the freight revenue.   Based on the terms of sale of this second

selected transaction, Commerce reasonably treated freight revenue as included in the

gross unit price and did not cap it.   For the reasons discussed, the Court finds that

Commerce's treatment of Hyosung's freight expense (and revenue) is based on

substantial evidence.

### b.  Hyosung's Expense Estimates in its Commission Agreements

ABB claims that Hyosung's net U.S. prices reported to Commerce differed from

the net U.S. prices Hyosung used to calculate commissions, and that the difference

reflected profit on certain services that were not part of the LPT unit and should not

have been included in the unit prices reported to Commerce.   Pl.'s MJAR at 25.   To

illustrate its claim, ABB points to a third selected transaction[15] and argues that

"revenues and expenses from services have not been netted out of gross unit price at

---

[15] This third selected transaction is identified in Hyosung's sales database as SEQU [[ ]].
*See* Pl.'s MJAR at 25.

the same level as they have been included in Hyosung's build-up of gross unit price reported to Commerce." *Id*. at 25-26.  Noting that Commerce focused on the wrong issue when it attributed the discrepancy to changes from estimated to actual expenses, ABB maintains that the data on the commission agreements show that the expenses used by Hyosung to build up "reported gross unit prices are inconsistent with the lower expenses reported as deductions to gross unit price." *Id*. at 26.  Defendant counters that ABB's claims are unsubstantiated because ABB relies on secondary documents to make assumptions about gross unit price, whereas Hyosung has provided corroborating documents to substantiate its U.S. price and expense data with respect to this third selected transaction, specifically, and commission expenses, generally.[16]  Def's Resp. at 19-20; *see also I&D Mem.* at 18-21.

This issue was broadly raised during the administrative proceeding and Commerce had an opportunity to review the expenses reported for this third selected transaction.  *See I&D Mem*. at 18-21; *see also Proprietary I&D Mem. – Hyosung* at 3-4; Hyosung's January 13, 2014, Section C Questionnaire Responses ("Hyosung Jan. 13 CQR") at Ex. C-19, CJA, Doc. 11; PJA, Doc. 11; C.R. 62-74; P.R. 76-78 (sales commission calculation).  It is clear from the Issues and Decision Memo and the

---

[16] Defendant also argues that ABB's claim is waived for failure to exhaust administrative remedies.  Def.'s Resp. at 19.  ABB replies that its claim regarding the third selected transaction is simply a different formulation of the same question: whether expenses deducted from gross unit price were the same as those used in the build-up of gross unit price.  Pl.'s Reply at 9 n.1.  The Court finds that ABB timely raised the issue in the administrative proceeding as demonstrated by Defendant's citations to the Issues and Decision Memo in support of its own position that Commerce's finding on this matter is supported by the record.  *See* Def.'s Resp. at 19-20; *see also I&D Mem*. at 18-21.

documentation Hyosung provided that Hyosung properly supported each of the

expenses used by Commerce in its margin calculation, including commissions and

ocean freight.  *See I&D Mem.* at 19-21; *see also* Hyosung Apr. 10 SQR at Exs. S-36A-

S-36C (purchase orders, invoices and sales representation agreements).  Hyosung

provided Commerce with "a copy of the commission statement sent to its U.S. sales

agent for this sale, a worksheet demonstrating how the commission documentation

reconciles to the U.S. sales listing, and documentation demonstrating that Hyosung paid

the commission amount listed on the commission statement and reported in Hyosung's

U.S. sales database."  *See I&D Mem.* at 19; *see also* Hyosung Apr. 10 SQR at Exs. S-

36A-S-36C.  In addition, Hyosung provided sample documentation, including

purchase/sales orders, contract amendments, invoices, payments and commission

agreements as needed, to support its commission calculations.  *I&D Mem.* at 19.  In

contrast, ABB points to a secondary document, a sample commission calculation, to

argue that Hyosung is reporting different expense data for the same sale.  Pl.'s MJAR at

25; *see also* Hyosung Jan. 13 CQR at Ex. C-19; Hyosung's First Supplemental Section

A Questionnaire Resp. ("Hyosung's Feb. 24 SAQR") at Ex. SA-26, CJA, Doc. 13; PJA,

Doc. 13; C.R. 199-206; P.R. 107.   That Hyosung may have used expense figures for

the purpose of negotiating its commissions that were different from those reported to

Commerce is inconsequential when Commerce has confirmed Hyosung's reported

expenses with documents directly related to the expense.  *See* Hyosung Jan. 13 CQR

at Ex. C-19; *see also* Hyosung Apr. 10 SQR at Ex. S-36.  Hyosung is under no

obligation to negotiate commissions with its commission agents based upon the actual

expenses calculated in the manner required by Commerce for antidumping reporting
purposes.  Any differences between the figures noted on the sample commission
document and the actual expenses reported to Commerce do not call into question the
accuracy of the expenses reported to Commerce and supported by the record.
Consequently, the Court finds Commerce's determination with regard to this issue to be
supported by substantial evidence.

### c.  Comparisons of Hyosung's Data Reported to Commerce and to Another Agency

ABB alleges that Hyosung's U.S. gross unit prices were inflated as reported to
Commerce because there is a difference between the figures reported to Commerce
and the figures reported to another agency.[17]  ABB attempts to combine this difference
with the changes from estimates to actual prices and expenses for several sales to call
into question the reliability of Hyosung's gross unit prices as reported.[18]  *See generally*
Pl.'s MJAR at 27-30.  Defendant notes that ABB's argument rests on a mistaken
premise that the two sets of data should match, when in fact different statutory and
regulatory schemes apply at each agency that use different base values and
adjustments.  Def.'s Resp. at 21; *see also I&D Mem.* at 8-10; *Proprietary I&D Mem. –
Hyosung* at 1-7.  Commerce found that ABB was effectively asking it to determine

---

[17] The agency in question is [[   ]].  Pl.'s MJAR at 27-30.
[18] Commerce examined this issue with regard to SEQU [[                              ]],
*Proprietary I&D Mem. – Hyosung* at 4-6, and ABB specifically calls out SEQU [[
  ]] as illustrative examples, Pl.'s MJAR at 29-30.  Here ABB alleges that Hyosung
reported [[                              ]] ocean freight in the U.S sales listing to Commerce
than it did to [[                              ]].  *See* Pl.'s MJAR at 29-30.

whether the data reported to the other agency was accurate and that Commerce is "not

in a position to make such a determination."  *Proprietary I&D Mem. – Hyosung* at 3.

Commerce reviewed supporting documentation for the data it received and concluded

that Hyosung had substantiated the data to Commerce's satisfaction.  *See* Def.'s Resp.

at 22; *I&D Mem.* at 21-22 (noting that Commerce relied on "supporting documentation

directly related to the expense itself (*e.g.* invoices, payment documentation) to verify a

respondent's reporting of actual expense data"); *Proprietary I&D Mem. – Hyosung* at 4-

6.

      The Court has already addressed and rejected ABB's broader arguments relating

to the differences between the estimated values and actual values reported for

overlapping sales.  With respect to the differences with data reported to another agency,

Commerce reviewed substantiating documentation and concluded that Hyosung had

accurately reported and supported its data to Commerce.  *See Proprietary I&D Mem. –*

*Hyosung* at 6 n.27 (citing Hyosung Jan. 13 CQR at Ex. C-13).  In addition to rejecting

ABB's general argument that the ocean freight amounts should match, Commerce

requested and reviewed data for certain of the identified transactions,[19] including the

third selected transaction for which Hyosung provided detailed documentation

---

[19] These include SEQU [[               ]].  Commerce identifies these specific sales as
examples where Hyosung provided source documentation demonstrating the accuracy
of its reporting of ocean freight expenses [[

                                           ]].  *See Proprietary I&D*

*Mem. – Hyosung* at 5-6.

supporting its reported expenses, such as ocean freight expenses.[20]  *See* Hyosung Jan.

13 CQR at Ex. C-13; Hyosung Apr. 10 SQR at Ex. S-29; *see also Proprietary I&D Mem.*

*– Hyosung* at 5-6.   Commerce thus reviewed, among other documents, purchase

orders, pricing proposals, invoices for international transport and oil, and entry

summaries, and these documents are part of the record.  *See* Hyosung Apr. 10 SQR at

Ex. S-29.  Given that Commerce reviewed and the record contains directly relevant

source documentation substantiating Hyosung's reported expenses, the Court finds that

Commerce's determination that Hyosung's data is reliable is supported by substantial

evidence on the record.  Commerce does not have an additional obligation to confirm

the veracity of information reported to another agency or to explain away differences in

reporting between Commerce and another agency when it has otherwise taken

adequate steps to address its record information.

### iii.  Hyosung's Installation Expenses

ABB argues that Hyosung's final dumping margin is inaccurate because Hyosung

reported its installation expenses improperly when it categorized them as direct selling

expenses in the home market and reported them as indirect selling expenses in the

U.S. market.  According to ABB, this difference in treatment had the effect of

understating the margin of dumping.  *See generally* Pl.'s MJAR at 34-35.  ABB raised

---

[20] Commerce reviewed corroborating documentation relating to SEQU [[ ]] and concluded that Hyosung had "accurately reported and substantiated its reported ocean freight amounts" and that specifically for SEQU [[ ]] "Hyosung provided complete source documentation supporting its reported ocean freight expenses for that sale."  *Proprietary I&D Mem. – Hyosung* at 6 & n. 27 (citing Hyosung Jan. 13 SQR at Ex. C-13) (emphasis omitted).

this argument during the administrative proceeding and Commerce determined that

Hyosung had documented all of its installation expenses accurately.  *I&D Mem.* at 22-

24.  Further, Commerce allocated Hyosung's installation expenses as reported

because, in each case, Hyosung reported the installation expenses in accordance with

the way they were maintained in their normal course of business.  *Id.* at 23-24; Analysis

of Data Submitted by Hyosung Corp. in the Prelim. Results of the 2012-2013 Admin.

Review of the Antidumping Duty Order on Large Power Transformers from the Republic

of Korea ("*Prelim. Mem. – Hyosung*") at 8-9, ECF No. 82-3; C.R. 423; P.R. 209.

Moreover, in the *Preliminary Analysis Memo* for Hyosung, Commerce put Hyosung on

notice that, going forward, Hyosung would need to track and report its installation

expenses consistently across the U.S. and home markets.  *See I&D Mem.* at 24; *Prelim.*

*Mem.  – Hyosung* at 8.[21]

ABB relies on 19 C.F.R. § 351.410(c) to argue that installation expenses are

necessarily direct because they bear a direct relationship to particular sales and that,

Hyosung's accounting practices notwithstanding, Commerce's decision to accept

Hyosung's expenses as reported is not supported by law.  *See* Pl.'s Reply at 10-12

---

[21]  According to Commerce,

> while we are accepting Hyosung's reporting of certain expenses for
> purposes of these preliminary results, going forward, the Department
> expects Hyosung to be consistent with regard to its reporting of installation
> and warranty expenses between the home and U.S. markets.
> Additionally, the Department expects Hyosung to report expenses related
> to the movement of existing LPTs consistently, and on a transaction-
> specific basis, in both the home and U.S. markets going forward.

*Prelim. Mem.  – Hyosung* at 8.

(citing 19 C.F.R. § 351.410(c)).  The regulation referenced by ABB simply provides the

definition of a "direct selling expense."[22]  The regulation does not speak to the treatment

of direct selling expenses.  Moreover, the statute directs Commerce to calculate costs

on the basis of the records of the producer or exporter of the merchandise.  *See* 19

U.S.C. § 1677b(f)(1).[23]

    The Court finds that Commerce's decision to allocate Hyosung's installation

expenses as reported is supported by substantial evidence and in accordance with the

law.  Commerce examined ABB's claim in detail during the administrative proceeding

and Hyosung responded to multiple questions regarding the tracking of its installation

expenses.  *See e.g.* Hyosung Jan. 13 CQR; *see also* Hyosung Apr. 10 SQR.  In its

questionnaire responses, Hyosung explained that the different reporting of expenses

was attributable to Hyosung's business accounting practices.  Hyosung Korea tracked

all installation expenses by project; however, Hyosung's U.S. affiliate, HICO, did not.[24]

---

[22] Pursuant to 19 C.F.R. § 351.410(c), "Direct selling expenses' are expenses, such as commissions, credit expenses, guarantees, and warranties, that result from, and bear a direct relationship to, the particular sale in question."

[23] Pursuant to 19 U.S.C. § 1677b(f)(1)(A), "costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country . . . and reasonably reflect the costs associated with the production and sale of the merchandise."

[24] According to Hyosung,
    based on agreements with the U.S. customer, HICO America is sometimes responsible for the installation of LPTs at the U.S. customer's designated location.  [[

                             ]]  HICO America [[

            ]].  Hyosung reports the installation costs it incurred on a transaction-specific basis.

As a result, some U.S. installation expenses were reported as indirect expenses.  *See*

*I&D Mem.* at 23-24; *see also Prelim. Mem. – Hyosung* at 8.  Hyosung supported its

explanation with corroborating documents.  *See generally* Hyosung Jan. 13 CQR.

Commerce determined that Hyosung had appropriately substantiated all its installation

expenses[25] and this determination is supported by substantial evidence on the record.

*See I&D Mem.* at 22-24; *Prelim. Mem. - Hyosung* at 8-9*; see also Proprietary I&D Mem.*

*– Hyosung* at 6-7.

　　　　Commerce's decision to accept Hyosung's installation expenses as reported also

is in accordance with the law.  While the regulations define direct expenses as those

which bear a direct relationship to a particular sale, the statute also directs Commerce

to calculate costs on the basis of the records of the producer or exporter of the

merchandise.  *See* 19 U.S.C. § 1677b(f)(1).  Commerce reasonably exercised its

discretion to accept Hyosung's installation expenses as reported and Hyosung's

explanation for the accounting inconsistency for the purpose of this first administrative

---

Hyosung Jan. 13 CQR at C-38, JA 100713.  However, in some cases,
　　　At the customer's request, HICO America will dispatch [[

　　　　　　　]]  Although HICO America incurs costs for the salary and travel
expenses of the [[
　　　　　　　　　]] of the installation process, HICO America does not track
these expenses by project number in its accounting records.
*See* Hyosung Apr. 10 SQR at 41.  Consequently, these U.S. installation expenses were
reported as indirect selling expenses.
[25] Commerce also rejected ABB's reliance on a comparison of the reported installation
expenses with the estimates used to negotiate Hyosung's commission payments.  As
discussed above, Commerce reasonably relied on the actual expenses as reported and
did not require a reconciliation with estimated expenses used to negotiate commission
agreements.  *I&D Mem.* at 23.

review, while Commerce also put Hyosung on notice that it will require consistent

reporting of these expenses in future reviews.[26]  *I&D Mem.* at 23-24; *Prelim. Mem. –*

*Hyosung* at 8-9.

### B.  Commerce's Decision to not Utilize Facts Otherwise Available with respect to Hyosung

ABB argues that Commerce should have utilized facts available to fill gaps or

reconcile differences in Hyosung's record data.  *See* Pl.'s MJAR at 33-36.  Section

1677e of Title 19  provides that Commerce may use "facts otherwise available" in

reaching the applicable determination if necessary information is not on the record or an

interested party withholds information that has been requested, fails to provide such

information in a timely manner, significantly impedes the proceeding, or provides

information that cannot be verified.  19 U.S.C. § 1677e(a);*see also* 19 C.F.R. § 351.308.

ABB argues that Hyosung's data is unreliable and that Commerce should have

applied facts otherwise available to arrive at the most accurate dumping margin.  *See*

Pl.'s MJAR at 33-36.  However, as discussed above, Commerce reviewed ABB's claims

during the administrative proceeding, issued multiple questionnaires to Hyosung

regarding alleged discrepancies, and ultimately concluded that Hyosung's reported data

was accurate.  Commerce determined that Hyosung credibly explained and

documented its reported data, that it was fully cooperative, and responded to each of

---

[26] Commerce found that Hyosung accurately reported and substantiated its reported installation expenses through "source documentation demonstrating the accuracy of its reporting of installation expenses to the Department."  *I&D Mem.* at 23 & n.105 (citing Hyosung Jan. 13 CQR at Ex. C-24; Hyosung Apr. 10 SQR at S-29).

Commerce's requests for additional information.  *See I&D Mem.* at 17-18.  As such, no

"necessary" information was missing from the record.    Thus, Commerce concluded

that neither facts available nor AFA was warranted.  *Id.*  Having reviewed ABB's claims

and having found no reason to disturb Commerce's determinations with regard to any of

the specific arguments, the Court sustains Commerce's determination on the application

of facts available or AFA.  ABB offers no additional support for this claim and instead is

asking the Court to reweigh the evidence.  The alleged discrepancies ABB identified in

the record have been reviewed by the Court and the Court has found that each of

Commerce's determinations was based on substantial evidence in the record and in

accordance with the law.  The Court, therefore, finds that Commerce's decision not to

use facts available or AFA is based on substantial evidence and in accordance with law.

## II.  **Hyundai's Final Dumping Margin/Hyundai's Reported Prices and Selling Expenses**

ABB argues that Hyundai's reported data on prices and selling expenses is

unreliable and that Commerce has a duty to calculate accurate margins and protect the

integrity of its own proceeding.[27]  *See generally* Pl.'s MJAR at 36-47.  As such, ABB

asserts that Commerce should have used AFA.  *Id*. at 39.  Further, ABB claims that

discrepancies in expenses reported by Hyundai for two selected transactions[28] resulted

in an improperly inflated gross unit price.  *Id*. at 45.  ABB also highlights discrepancies

---

[27] In addition to making an overarching argument, ABB identifies two selected transactions to illustrate its claim.  These are SEQU [[  ]] and [[  ]] respectively.  *See, e.g.,* Pl.'s MJAR at 37.

[28] *See supra* note 27.

in the sequencing of certain documents that Hyundai provided to a separate agency[29] (and placed on Commerce's record in order to substantiate its own reporting) to further argue that Hyundai's data, as reported, is unreliable.  Pl.'s MJAR at 43-47.   Defendant argues that Hyundai adequately explained the alleged differences between the data that it reported to Commerce and to another agency, and that Commerce was able to independently verify Hyundai's data through its own questionnaires.  *See generally* Def.'s Resp. at 27-32.  Defendant asserts that, for these reasons, AFA was not warranted.  *Id*. at 31-32.  Defendant also notes that ABB's claims regarding the markup in gross unit price for two selected transactions were waived for failure to exhaust.  *Id*. at 30.  Finally, Defendant argues that Commerce reasonably determined that discrepancies in sequencing concerning a subset of Hyundai's sales were insufficient to "outweigh the remaining record evidence indicating that Hyundai's reported data are reliable."  *Id*. at 31.  For the reasons discussed below, the Court sustains Commerce's findings on the issue of whether AFA was warranted as a result of alleged discrepancies in data between Commerce and another agency.   The Court also finds that ABB's claims regarding an alleged improper markup in gross unit price were not exhausted below.  Finally, the Court remands the issue raised by ABB regarding the sequencing of certain documents.

---

[29] The agency in question is [[   ]].  ABB relies on a third selected transaction, SEQU [[   ]], as an illustration, but notes that similar sequencing issues exist for SEQU [[
         ]].  Pl.'s MJAR at 46.

### A. Differences in Data Reported to Commerce and Another Agency

ABB argues that there were differences between the data Hyundai reported to Commerce and another agency which should have led Commerce to deem the data generally unreliable and Commerce should instead have used facts available or AFA to calculate Hyundai's dumping margin. *See generally* Pl.'s MJAR at 36-47. ABB also alleges that a series of representations Hyundai made to the other agency should have spurred Commerce to find Hyundai's data unreliable[30] and that doing so would have satisfied Commerce's responsibility to calculate accurate dumping margins and to protect the integrity of its own proceedings. *Id.* at 45-47. Defendant contends that Hyundai provided full explanations for the differences between expenses reported to the other agency and Commerce and that it is not Commerce's obligation to evaluate the accuracy of Hyundai's submissions to another agency. Def.'s Resp. at 27.

The Court is mindful that while Commerce has a responsibility to ensure the integrity of its own proceedings and to ensure that the data it uses in its margin calculations is accurate and supported by the record, this obligation does not extend to ensuring the accuracy of data or information that a respondent may report to another agency. It is clear from the record that, particularly on the issue of differences between data reported to Commerce and to the other agency, Hyundai fully participated in the review by responding to numerous questionnaires and supplemental questionnaires and

---

[30] ABB argues that Hyundai [[

]]  Pl.'s MJAR at 38.

by providing supporting documentation.  *See Proprietary I&D Mem. – Hyundai* at 5,

17.[31]   On the basis of Hyundai's responses, Commerce concluded that Hyundai's data,

as it was reported to Commerce, was reliable, and that Hyundai's explanations for any

alleged inconsistency were credible and sufficient.  *Id.* at 5-6.  Further, Commerce noted

that it was not in a position to draw conclusions on the reliability of data reported to it

from representations made to another agency when the data reported to Commerce

was appropriately substantiated.  *Id*.  Finally, Commerce stated that it was not in a

position to determine whether representations made to the other agency were accurate

as that was a matter properly within the purview of the other agency.  *Id.*  It is not the

Court's role to reweigh evidence already considered by the agency and there is

substantial evidence supporting Commerce's determination to rely on the information

presented to it by Hyundai.  Therefore, the Court finds no reason to upset the agency's

finding on this issue.  ABB does not offer any further evidence supporting its claim that

Hyundai's data in this regard is unreliable.[32]  Thus, the Court is satisfied that

---

[31]Hyundai responded to over 11 questionnaires and supplemental questionnaires.
*Proprietary I&D Mem. – Hyundai* at 17.
[32] To illustrate its overarching argument, ABB points to two selected transactions and
argues that, for these transactions, Hyundai reported higher [[
                                                  ]] than to Commerce.  Pl.'s MJAR at 44.  In its brief to this
Court, ABB argues that for one selected transaction, SEQU [[  ]], Hyundai gave the
other agency a commercial invoice for [[
                                        ]] than the amount it reported to Commerce.  *Id*. at 44.  Defendant-Intervenor
Hyundai explains to the Court that this difference is attributable to the fact that
Commerce "required Hyundai to report the amount of the expense that it incurred from
the third-party vendors" and not the amount that HHI charged to Hyundai.  Conf.
Hyundai Heavy Industries Co., Ltd. and Hyundai Corp. USA's Resp. to Pl.'s Mem. in
Supp. of its R. 56.2 Mot. For J. on the Agency R. ("Hyundai Resp.") at 12, ECF 62.
Further, Hyundai claims that the alleged differences were resolved by [[

Commerce's conclusion that Hyundai sufficiently substantiated its reporting to the

Department is based on substantial evidence on the record.

On the limited question of whether Commerce should have used AFA due to

differences in reporting to Commerce versus another agency, the Court is not

persuaded by ABB's argument.  This court has previously found that the use of facts

available or AFA is warranted when an interested party "failed to accurately respond" to

Commerce's questions and subsequently "fail[ed] to credibly explain the

inconsistencies" identified by it in the course of the administrative review, leading

Commerce to "reasonably infer" that the party "purposefully withheld [] information to

---

]] and that ABB does not compare the actual expense
documentation submitted to [[   ]] in Hyundai's later representations (which are part of
the record for this administrative review) in making this allegation anew.  *Id.*
    ABB makes a similar allegation with respect to a second selected transaction,
SEQU [[  ]], that Hyundai reported [[         ]] import-related charges for [[
                                              ]] to [[   ]] than to
Commerce, but ABB does not further develop this argument before the Court and
neither Defendant nor Defendant-Intervenor Hyundai provide a detailed response.  *See*
Pl.'s MJAR at 43-44; Def.'s Resp. at 27-30; *see also* Hyundai Resp. at 12 (noting, as
with SEQU [[  ]], that ABB compares third-party invoices rather than direct expense
documentation Hyundai provided to Commerce and that the alleged differences were
resolved by the prior disclosures).  The Court again looks to its standard of review for
Commerce final determinations.  Here, Plaintiff's allegations continue to rest on
differences that are rooted in Hyundai's reporting to another agency, that have been
addressed by Commerce in the Final Results and by this Court, and that do not rise
above the level of allegations lacking substantiating documentation.  ABB does not offer
any further evidence to the Court supporting its claim that Hyundai's data in this regard
is unreliable and does not provide an argument for why an invoice between Hyundai
and HHI (two affiliated parties) should be given more weight in contrast to the third party
invoice that represents the actual [[         ]] expense paid by Hyundai to the [[
          ]].  Thus, the Court is satisfied that Commerce's conclusion that Hyundai
sufficiently substantiated its reporting to the Department is based on substantial
evidence on the record.

avoid a higher dumping margin." *Shanghai Taoen Int'l Trading Co. v. United States*, 29

CIT 189, 195, 360 F. Supp 2d 1339, 1344-45 (CIT 2005).  Given that Hyundai

responded to multiple questionnaires and supplemental questionnaires, and supported

its responses with source documentation, Commerce concluded that it cooperated with

the review to the best of its ability.  *Proprietary I&D Mem. – Hyundai* at 5, 17.  While

ABB is dissatisfied with Hyundai's explanation for the alleged differences in reporting to

Commerce and the other agency, it offers the Court nothing further than the argument it

already made to Commerce and which Commerce already considered.  There is

nothing in the record that supports ABB's allegation that Hyundai failed to accurately

respond or credibly explain inconsistencies, or purposely withheld information to avoid a

higher dumping margin.  On the contrary, to the extent that there may have been issues

with Hyundai's reporting to the other agency, Hyundai placed those and related

documents on the record for Commerce to review.  *See* Hyundai Resp. at 12.  On this

basis, Commerce concluded that Hyundai's explanation for the alleged differences was

credible and that, in any event, Hyundai had sufficiently substantiated its reporting to

Commerce.  *See Proprietary I&D Mem. – Hyundai* at 5-6, 17.  The Court finds no

reason to disturb Commerce's finding on this issue.  In light of Commerce's general

finding that Hyundai's data, as reported, is accurate, the fact that Hyundai made distinct

representations to another agency, by itself, is not sufficient to call into question

Hyundai's data or to warrant an application of facts available or AFA.

As to Plaintiff's claim that discrepancies in expenses reported to Commerce

regarding the two selected transactions resulted in an improperly inflated gross unit

price, the Court considers whether these claims were exhausted below.  "[T]he Court of

International Trade shall, where appropriate, require the exhaustion of administrative

remedies." 28 U.S.C. § 2637(d).  Exhaustion of administrative remedies is a doctrine

that holds "that no one is entitled to judicial relief for a supposed or threatened injury

until the prescribed administrative remedy has been exhausted." *Consol. Bearings Co.*

*v. United States*, 348 F.3d 997,1003 (Fed. Cir. 2003) (internal quotation marks and

citation omitted).  Commerce regulations require in order to preserve claims for appeal

that parties raise all arguments before it in their case briefs.  *See* 19 CFR § 351.309.[33]

This has been confirmed by the Federal Circuit.  *See Qingdao Sea-Line Trading Co.*

*Ltd. v. U.S.*, 766 F.3d 1378, 1388 (Fed. Cir. 2014) (Commerce regulations require

presentation of all issues and arguments in a party's administrative case brief)*; Dorbest*

*Ltd v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010) (insufficient for party to have

raised an issue in a footnote in the rebuttal brief or during the ministerial comment

period when the issue was not raised in the party's case brief). Issues not raised before

the agency in case and rebuttal briefs are waived for failure to exhaust and cannot be

raised on appeal before the CIT.[34]  28 U.S.C. § 2637(d).  There are exceptions to the

---

[33] *See* 19 C.F.R. § 351.309(c)(2) ("The case brief must present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination or final results, including any arguments presented before the date of publication of the preliminary determination or preliminary results."); *see also* 19 C.F.R. § 351.309(d)(2) ("The rebuttal brief may respond only to arguments raised in case briefs and should identify the arguments to which it is responding.")

[34] Parties are able to raise ministerial errors with the Department if such errors appear in the Final Results.  *See* 19 C.F.R. 351.224(e).

requirement of exhaustion, to be applied at the court's discretion, but none of the

exceptions apply here.[35]

ABB argues that its claim that overstated freight costs for two selected

transactions[36] were included in gross unit prices as reported to Commerce was

appropriately raised during the administrative proceeding.  Pl.'s Reply at 15.  In its

Reply, ABB cites to its case brief as proof that it had raised this issue during the

administrative proceeding; however a close review of ABB's own citation shows that

ABB only made a generalized claim regarding Hyundai's allegedly inconsistent reporting

to Commerce and to another agency.[37]  *See* Pl.'s Reply at 15-16; Pet'rs Case Br.

Regarding Hyundai ("ABB Case Br.") at 12-13, ECF No. 78-3; P.R. 245.  ABB's case

brief does not make the argument that for the selected transactions Hyundai also

reported improperly marked up expenses that were passed on in the gross unit price

---

[35] There is no exhaustive list of exceptions.  Previously enumerated exceptions include futility, an intervening court decision such that the new interpretation would impact the agency's actions, pure question of law, or when plaintiff had no reason to believe the agency would not follow established precedent.  *See Luoyang Bearing Factory v. United States,* 26 CIT 1156, 1186, n.26, 240 F. Supp. 2d 1268, 1297 n.26 (2002) (collecting cases).  The Court has also found exceptions to exhaustion when a private party is denied access to critical information at a time when its case brief is due or when requiring exhaustion is burdensome such that it would result in "undue prejudice to subsequent assertion of a court action."  *See Corus Staal BV v. United States,* 502 F.3d 1370, 1381 (Fed. Cir. 2007) (citation omitted).
[36] SEQU [[  ]] and [[  ]].
[37] ABB argues in its case brief that "[f]or SEQU [[  ]] for example, the [[

        ]]  Any claim that [[
                                        ]] does not stand up to scrutiny" and further that
"[[
                                                                        ]]"  ABB
Case Br. at 12-13.

reported to Commerce. The Federal Circuit has confirmed that in order to exhaust

remedies, parties must raise all issues and arguments in briefing before the agency.

*See Dorbest,* 604 F.3d at 1375; *Qingdao Sea-Line Trading Co. Ltd.*, 766 F.3d at 1388.

Arguing that there were discrepancies in data reported to two different agencies related

to two sales observations, particularly when there is an independent rationale for those

discrepancies, is not the same as arguing that improperly marked up expenses were

included in the calculation of gross unit price. The Court, therefore, is persuaded that

ABB failed to exhaust this claim during the administrative proceeding because merely

bringing up a general issue does not serve to "exhaust[] all specific issues under that

general umbrella." *Trust Chem Co. Ltd. v. United States*, 35 CIT __,__ 791 F. Supp. 2d

1257, 1268 n. 27 (2011) (citing *Gerber Food (Yunnan) Co. v. United States,* 33 CIT 186,

195, 601 F. Supp. 2d 1370, 1379 (2009)). Further, the Court finds that a discretionary

exception to exhaustion is not warranted in this case.

### B. Sequencing

ABB argues that there were other inconsistencies in Hyundai's reporting,

specifically, the sequencing of documents provided by Hyundai to another agency as

part of the representations Hyundai made to the other agency related to a third selected

transaction.[38] ABB alleges that for the third selected transaction the HHI/Hyundai sales

contract is dated after the date of the commercial invoice and the date of entry to the

---

[38] The third selected transaction for Hyundai is SEQU [[  ]]. Pl.'s MJAR at 40.

United States.[39]  Pl.'s MJAR at 46.  ABB further notes that the same/similar document

sequencing problem also applies to certain other U.S. observations.[40]  *Id*.  Defendant

acknowledges this issue was raised during the proceeding but avers that Commerce

made a reasonable determination that ABB's alleged discrepancies "concerning a

subset of Hyundai's U.S. sales did not outweigh the remaining record of evidence

indicating that Hyundai's reported data are reliable."  Def.'s Resp. at 31.

     The Court cannot agree that Commerce's determination was based on

substantial evidence.  In the Proprietary Issues and Decision Memo for Hyundai,

Commerce acknowledged that Hyundai did not address the sequencing of documents,

but concluded that this was an issue that normally would have been resolved through

supplemental questionnaires.  *Proprietary I&D Mem. – Hyundai* at 12.  Such

supplemental questionnaires, however, were never sent and, therefore, Hyundai never

explained these discrepancies.[41]  *Id*.  Similarly, with respect to the third selected

transaction, Commerce noted that Hyundai did not address the discrepancy but also

acknowledged that Commerce did not ask Hyundai to provide further information, even

---

[39] ABB alleges that documents provided by Hyundai to "[[


]]"  Pl.'s MJAR at 46.

[40] Specifically, SEQU [[                                                      ]].  Pl.'s MJAR at 46.

[41] Commerce noted that "Hyundai failed to answer Petitioner's concerns with respect to the [[                                                      ]]" but that "this is an issue that would normally be addressed in supplemental questionnaires, and for the purposes of the final results, the Department is unable [to] question the [[                                                      ]]" *Proprietary I&D Mem. – Hyundai* at 12.

though ABB had raised similar concerns for additional sales observations.[42]  *Id*. at 15.

While Defendant argues that Commerce made a reasonable finding that Hyundai's

reported data is reliable regardless of the discrepancies in sequencing, Defendant's

supporting citations point to a separate finding that AFA is not warranted.[43]  *See* Def.'s

Resp. at 31.  Thus, even this statement is unsupported by the record.  Neither

Commerce nor Defendant-Intervenor offered any further explanation in briefing to this

Court or during oral argument.

 In light of Commerce's apparent recognition that questions remain as to

Hyundai's reported data for the above sales, and no clear statement or explanation from

Commerce whether Hyundai's reported data is sufficient and reliable regardless of this

discrepancy, the Court cannot find that Commerce's decision to rely on these

documents without further query or explanation is supported by substantial evidence.

Therefore, the Court remands the issue of discrepancies in sequencing for the third

selected transaction and the related U.S. observations,[44] so that Commerce may further

investigate and/or explain its conclusion.

---

[42] Commerce noted that Hyundai does not address the [[

                      ]]," but concluded that "the Department did
not ask about this discrepancy in a supplemental questionnaire" even though "Petitioner
raised concerns of a similar nature with respect to [[  ]] other observations."
*Proprietary I&D Mem. – Hyundai* at 15.
[43] In sections addressing ABB's arguments that Commerce should apply AFA,
Commerce noted that the criteria for an application of AFA had not been met because
Hyundai had cooperated to the best of its ability and provided satisfactory explanations
to Commerce's questions, including by responding to [11] questionnaires.  *See I&D
Mem.* at 42-43, 53-54; *Proprietary I&D Mem. – Hyundai* at 15-17.
[44] SEQU [[            ]].

### C.  Commerce's Decision not to Apply Facts Available or AFA

ABB argues that, based on the alleged discrepancies noted above, Hyundai's data was sufficiently unreliable to "necessitat[e] application of adverse facts available." Pl.'s MJAR at 39.  Defendant argues that Commerce's decision not to apply AFA was a proper exercise of discretion and not warranted under law.  Def.'s Resp. at 31-32.  In light of the Court's conclusion on the sequencing of documents (above), the Court does not reach this issue at this time.

### III.  Home Market Commission Offset for Hyosung and Hyundai

ABB argues that Commerce erred in granting Hyundai and Hyosung a home market commission offset related to commissions on sales made in the United States. According to ABB, Hyundai and Hyosung incurred these commissions "inside" the United States.  Because they were incurred inside the United States, ABB argues these commissions should be deducted from constructed export price ("CEP") under the statute and Hyundai and Hyosung should not receive a commission offset to normal value ("NV").  Pl.'s MJAR at 48.  Defendant argues that ABB has waived any challenge to the commission offsets because it failed to exhaust its administrative remedies before Commerce.[45]  Defendant asserts that Commerce indicated its intention to grant the commission offsets in the Preliminary Results and ABB did not challenge this decision in its case briefs before the agency.  Def.'s Resp. at 33-34 (citing *Prelim.  Mem. -*

---

[45] Hyundai agrees that ABB failed to raise the commission offset issue after the Preliminary Results and that Commerce's granting of the commission offset is not a ministerial error.  Hyundai asserts that granting the commission offset was specifically intended and referenced in the Preliminary Analysis Memo for Hyundai.  Hyundai Resp. at 14-16; *see also Prelim. Mem. – Hyosung* at 13.

*Hyosung* at 13).  ABB replies that it timely raised the issue because Commerce

announced changes to its treatment of U.S. commissions in both the Amended Final

Results and the Second Amended Final Results issued following the publication of the

Final Results.  Pl.'s Reply at 19.

The statute directs Commerce to deduct from the price used to establish CEP

"commissions for selling the subject merchandise in the United States," 19 U.S.C. §

1677a(d)(1)(A), and the profit allocated to such commissions, 19 U.S.C. § 1677a(d)(3).

Commerce claims that its practice has been to recognize two types of commissions paid

on U.S. sales: (i) commissions incurred <u>inside</u> the United States, for which Commerce

deducts the commission expenses from the price used to establish CEP, and (ii)

commissions incurred <u>outside</u> the United States, for which Commerce deducts the

commission expenses from the price used to establish CEP and offsets these

deductions in the home market.  *See* Def.'s Resp. at 32-33; *see also* 19 U.S.C. §

1677a(d); 19 U.S.C. § 1677b(7).  Commerce may make a "commission offset" in certain

cases when a commission is paid in relationship to the U.S. sale, but not the

comparison market sales.  *See* 19 C.F.R. § 351.410(e).

Defendant argues that Commerce made its "methodological decision to provide a

home market commission offset in the *Preliminary Results*." Def.'s Resp. at 32, 34.

Defendant claims that Commerce determined that "Hyosung and Hyundai incurred their

commissions *outside of the United States* and, therefore, that a commission offset was

warranted."  Def.'s Resp. at 33 (citing *Prelim. Mem. – Hyundai* at 13) (emphasis added).

However, the Preliminary Analysis Memo for Hyundai cited by Defendant does not

support the Defendant's assertion.  In fact, the memo concludes quite the opposite,

stating that "while these [commission and other] expenses were *incurred in the United*

*States*, we note that the sale was made prior to importation."   *Prelim. Mem. – Hyundai*

at 10, 13 (emphasis added).  Moreover, the cited document is devoid of any reference

to a commission offset, whether it was being granted or denied.  *Id*. at 13.  Instead, the

document discusses the calculation of the CEP offset, a distinct adjustment, associating

it with the difference in the level of trade and omitting any reference to commissions.  *Id*.

Therein, Commerce also stated that "we are not including commission, […] and other

related expenses as "CEP 'Other' Expenses." *Id*. at 10.

In the margin calculation program accompanying the Second Amended Final

Results, Commerce indicates that the field "CEPOTHER" would normally include "Any

other CEP (incurred in the U.S.) commissions [...]," however, Commerce appears to

have excluded U.S. commissions from this field, suggesting that Commerce treated

them as if they were incurred outside the United States.  Margin Calculation Program –

Sec. Am. Final – Hyundai (June 2015) at 38, ECF No. 82-6; C.R. 581.  Similarly, the

U.S. commissions field is set to equal the reported commissions ("USCOMM =

COMMU"), with the description for this field indicating that "All commissions on EP

sales, and those on CEP sales incurred outside of the U.S. [. . .] Do NOT include

commissions on CEP sales incurred in the U.S. here, instead include these in

CEPSELL." *Id*.  Again, it appears that Commerce treated the commissions as having

been incurred outside of the United States.  Thus, Commerce's treatment of U.S.

commissions in the margin calculation program is inconsistent with its characterization of those commissions in the Second Amended Final Results.

While the purpose of the exhaustion doctrine is to "allow[] the agency to apply its expertise, rectify administrative mistakes, and compile a record adequate for judicial review–advancing the twin purposes of protecting administrative agency authority and promoting judicial efficiency," *Carpenter Tech. Corp. v. United States*, 30 CIT 1373, 1374–75, 452 F. Supp. 2d 1344, 1346 (2006) (citing *Woodford v. Ngo*, 548 U.S. 81, 88–90 (2006)), the Court of Appeals for the Federal Circuit has held that the application of exhaustion principles in trade cases is exercised with a measure of discretion by the Court.  *See, e.g.*, *Corus Staal*, 502 F.3d at 1381; *Norsk Hydro Canada, Inc. v. United States*, 472 F.3d 1347, 1356 n.17 (Fed. Cir. 2006); *Consol. Bearings*, 348 F.3d at 1003.

In this case, ABB did not exhaust its administrative remedies.  ABB's administrative case and rebuttal briefs do not make arguments about the treatment of commissions or whether a commission offset was granted, and ABB does not provide any citations in its briefing to this Court that would show that ABB made this argument to Commerce before the issuance of the Final Results.  Despite Commerce's general policy with respect to the treatment of U.S. commissions incurred inside and outside the United States, the Preliminary Analysis Memo indicates that Commerce was diverging from that policy.  *See Prelim. Mem. – Hyundai* at 10, 13.  Nevertheless, Commerce did not discuss the implications of this divergence on whether it would provide a commission offset in this case.  The Court finds that it is not appropriate to require ABB to have exhausted its administrative remedies in this case when Commerce failed to

adequately address its treatment of commission offsets in the preliminary determination. Such notice was necessary in this particular case because Commerce indicated that it was not treating the U.S. commissions in accordance with its normal practice, but it did not explain the extent of its different treatment.

The Court will remand this issue to Commerce for further clarification.  Upon remand, Commerce is to explain its treatment of the respondents' U.S. commissions, the record basis for such treatment, whether such U.S. commissions result in the granting of commission offsets, and the legal and factual basis for the granting or denial of the commission offsets.

## CONCLUSION

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's Final Determination is remanded to Commerce to further address the sequencing of certain of Hyundai's documents in the record, as set forth in Discussion Section II.B above; and it is further

**ORDERED** that the Court defers ruling on the issue of whether Commerce should have applied facts available or AFA in calculating Hyundai's dumping margin with respect to the discrepancies in the sequencing of Hyundai's documents alleged by ABB during the administrative proceeding; and it is further

**ORDERED** that Commerce's Final Determination is remanded to Commerce to further explain its treatment of the respondents' U.S. commissions, the record basis for such treatment, whether such U.S. commissions result in the granting of commission

offsets, and the legal and factual basis for the granting or denial of the commission

offsets, as set forth in Discussion Section III above; and it is further

**ORDERED** that Commerce shall file its remand results on or before January 5,

2017; and it is further

**ORDERED** that the agency must file an index of any new administrative record

documents on or before January 19, 2017; and it is further

**ORDERED** that parties may file and serve comments in opposition to the remand

determination on or before February 6, 2017; and it is further

**ORDERED** that defendant and other parties supporting the remand

determination may file and serve responsive comments in support of the remand

determination on or before March 8, 2017; and it is further

**ORDERED** that parties must file a joint appendix of any record documents cited

in their comments on or before March 15, 2017; and it is further

**ORDERED** that any comments or responsive comments must not exceed 2500

words.


                                                    /s/      Mark A. Barnett____
                                                    Mark A. Barnett, Judge

Dated: October 7, 2016_____
        New York, New York