Slip Op. 17-137

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ABB, INC., <br><br>    Plaintiff, <br><br>    v. <br><br> UNITED STATES, <br><br>    Defendant, <br><br>    and <br><br> HYUNDAI HEAVY INDUSTRIES CO., LTD., HYUNDAI CORPORATION USA, HYOSUNG CORPORATION, AND HICO AMERICA SALES AND TECHNOLOGY, INC., <br><br>    Defendant-Intervenors. | Before: Mark A. Barnett, Judge <br><br> Court No. 15-00108 |

OPINION

[Commerce's remand redetermination is sustained.]

Dated: October 10, 2017

*R. Alan Luberda,* Kelley Drye & Warren LLP, of Washington, DC, argued for plaintiff. With him on the brief were *David C. Smith, Jr.* and *Melissa M. Brewer.*

*John J. Todor,* Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With him on the brief were *Chad A. Readler,* Acting Assistant Attorney General, *Jeanne E. Davidson,* Director, and *Franklin E. White, Jr.,* Assistant Director. Of Counsel was *James Henry Ahrens, II,* Attorney, U.S. Department of Commerce, Office of Chief Counsel for Trade Enforcement and Compliance, of Washington, DC.

*David Edward Bond,* White & Case, LLP, of Washington, DC, argued for defendant-intervenor Hyundai Heavy Industries, Co., Ltd. and Hyundai Corporation USA. With him on the brief were *Walter Joseph Spak, William Joseph Moran,* and *Ron Kendler.*

*Jaehong David Park,* Arnold & Porter Kaye Scholer LLP, of Washington, DC, argued for defendant-intervenors Hyosung Corporation and HICO America Sales and Technology, Inc.  With him on the brief were *Daniel Robert Wilson*, *Henry David Almond, Andrew Mercer Treaster*, and *Sylvia Yun Chu Chen.*

Barnett, Judge:  This case comes before the court following the Department of

Commerce's ("Commerce") redetermination on remand in the first administrative review

of the antidumping duty order on large power transformers from the Republic of Korea

("Korea"), for the period of review ("POR") February 16, 2012, through July 31, 2013

("POR 1").  Confidential Final Results of Redetermination Pursuant to Court Remand

("Remand Results"), ECF No. 104-1;[1] *see also ABB Inc. v. United States* (*ABB I*), 40

CIT ___, 190 F. Supp. 3d 1159 (2016).[2]

---

[1] The administrative record for this case is divided into a Public Administrative Record ("PR"), ECF No. 26-9, and a Confidential Administrative Record ("CR"), ECF No. 26-8. With the remand, Commerce also submitted a Confidential Remand Administrative Record ("CRR"), ECF No. 106-3, and a Public Remand Administrative Record ("PRR"), ECF No. 106-2.  Parties submitted joint appendices containing all record documents cited in their briefs at the conclusion of their pre-remand motions.  *See* Public Joint App. ("PJA"), ECF No. 72; Confidential Joint App. ("CJA"), ECF No. 71.  Citations are to the confidential joint appendix unless stated otherwise.  Additionally, the court requested complete versions of certain record documents for which parties had only submitted selected pages in the joint appendices.  These are cited separately as they appear in this opinion.

[2] Commerce published its final results of the antidumping duty order on large power transformers from Korea for POR 1 on March 31, 2015.  *Large Power Transformers from the Republic of Kore*a, 80 Fed. Reg. 17,034 (Dep't Commerce Mar. 31, 2015) (final results of antidumping duty admin. review; 2012-2013) ("*Final Results*"), CJA 1; PJA 1; PR 276; ECF No. 71-1, and accompanying Issues and Decision Mem., A-580-867 (Mar. 23, 2015) ("I&D Mem."), CJA 2; PJA 2; PR 261; ECF No. 71-1.  Commerce then twice amended its *Final Results*.  *Large Power Transformers from the Republic of Korea*, 80 Fed. Reg. 26,001 (Dep't Commerce May 6, 2015) (am. final results of antidumping duty admin. review; 2012-2013), CJA 3; PJA 3; PR 291; ECF No. 71-1, and accompanying Am. Final Results of the Antidumping Duty Admin. Review of Large Power Transformers from the Republic of Korea; 2012-2013: Allegations of Ministerial Errors (Dep't Commerce Apr. 28, 2015), CJA 42; PJA 42; PR 284; ECF No. 71-11; *Large*

In *ABB I*, the court directed Commerce to "further address the sequencing of

certain of [Hyundai Heavy Industries Co., Ltd. and Hyundai Corporation USA's

(collectively "Hyundai")] documents in the record," and "defer[red] ruling on the issue of

whether Commerce should have applied facts available or [adverse facts available

("AFA")] in calculating Hyundai's dumping margin with respect to the discrepancies in

the sequencing of Hyundai's documents alleged by ABB." *ABB I*, 190 F. Supp. 3d at

1164, 1184. The court also directed Commerce to "further explain its treatment of the

respondents' U.S. commissions, the record basis for such treatment, whether such U.S.

commissions result in the granting of commission offsets, and the legal and factual

basis for the granting or denial of the commission offsets." *Id.*

Upon consideration of the court's remand instructions, Commerce issued a

supplemental questionnaire to Hyundai on November 1, 2016, to which Hyundai

responded on November 10, 2016. *See* Remand Results at 6 and nn.27, 28.

Commerce issued a draft redetermination on December 8, 2016, and all parties

submitted comments in response. Remand Results at 6. Commerce filed its final

remand redetermination with the court on February 2, 2017. *See generally* Remand

Results. Based upon Hyundai's response to the supplemental questionnaire,

Commerce found that Hyundai sufficiently explained and clarified the sequencing of

---

*Power Transformers from the Republic of Korea*, 80 Fed. Reg. 35,628 (Dep't
Commerce June 22, 2015) (second am. final results of antidumping duty admin. review;
2012-2013), CJA 4; PJA 4; PR 304; ECF No. 71-1, and accompanying Second Am.
Final Results of the Antidumping Duty Admin. Review of Large Power Transformers
from the Republic of Korea; 2012-2013: Allegations of Ministerial Error (Dep't
Commerce June 15, 2015), CJA 44; PJA 44; PR 294; ECF No. 71-11.

certain of its sales documents.  *Id.* at 16-22.  No party challenges Commerce's redetermination on this issue.

Commerce also found that the "respondents' U.S. commissions were incurred in the United States" and declined to "grant[] home market commission offsets to Hyosung and Hyundai," explaining that "when [ ] commission expenses on U.S. sales are incurred in the United States and there are no commission expenses in the home market, which is the case here, such commission expenses are treated as [constructed export price or] CEP selling expenses and the commission expenses and allocated profit get deducted from the price used to establish CEP, and [ ] there are no home market commission offsets granted."  *Id.* at 39.  Both Hyosung and Hyundai (together "respondents") challenge Commerce's redetermination on this issue.  *See generally* Hyosung's Comments on Remand Results ("Hyosung's Comments in Opp'n"), ECF No. 110; Def.-Ints.' Comments in Opp'n to the Final Results of Redetermination Pursuant to Court Remand ("Hyundai's Comments in Opp'n."), ECF. No. 111.  ABB supports Commerce's redetermination.  *See generally* Plaintiff ABB, Inc.'s Comments in Supp. of the Results of Remand Determination ("ABB's Comments in Supp."), ECF No. 115.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to § 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012),[3] and 28 U.S.C. § 1581(c).  The court

---

[3] All further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, 2012 edition, and all references to the United States Code are to the 2012 edition, unless otherwise stated.

will uphold an agency determination that is supported by substantial evidence and

otherwise in accordance with law.   19 U.S.C. § 1516a(b)(1)(B)(i).

DISCUSSION

## I.  The Sequencing of Certain of Hyundai's Documents

In briefing its original motion to the court, ABB had argued that a number of

Hyundai's sales documents for specific sales contained discrepancies in their dates.

Conf. Pl.'s Mem. of Law in Supp. of Mot. for J. on the Agency R. ("Pl.'s Mem.") at 46,

ECF No. 45-1.  ABB had raised this issue during the administrative proceeding and

Commerce "acknowledged that Hyundai did not address the sequencing of documents,

but concluded that this was an issue that normally would have been resolved through

supplemental questionnaires."  *ABB I*, 190 F. Supp. 3d at 1181.  Given that Commerce

recognized that questions existed as to Hyundai's reported data, the court remanded

the sequencing issue so that Commerce could further address the sequencing of certain

of Hyundai's sales documents.  *Id.* at 1182, 1184.  Familiarity with the more detailed

discussion of this issue in *ABB I* is assumed.

In light of the court's remand instructions, Commerce requested, and Hyundai

provided, explanations for the sequencing of the documents.  Hyundai explained that it

had a "back-to-back" sales process whereby Hyundai Heavy Industries Co., Ltd. ("HHI")

concluded initial contracts with an affiliated middleman "well before the shipment of the

transformers to the United States" and then "HHI issued invoices directly to Hyundai

USA and later formalized the agreement in *pro forma* contracts."  Remand Results at

17.  At the time of shipment, Hyundai "prepare[d] a commercial invoice, which reflected

the agreement in principle . . . regarding the transfer price for the transformer," but "the

contracts [were] not finalized until the division of the scope of work between the entities

ha[d] been agreed upon." *Id.*  Hyundai noted that there were "instances [in which] the

preparation of the contract . . . was delayed," but that this was not "problematic given

[the companies'] close corporate relationship, their agreement in principle, and the

confirmation of the transfer price in the commercial invoices." *Id.*  Further, Hyundai

acknowledged that there were instances in which contracts were "revised . . . to reflect

change orders from the ultimate U.S. customers." *Id*.  Hyundai supported its assertions

with "copies of the initial contracts, contracts between HHI and Hyundai USA (including

revised contracts), commercial invoices, and customs entry documents, along with [a]

worksheet [] show[ing] the initial contract dates . . . for the U.S. sales

identified/requested by [Commerce]." *Id.* at 18.

   Commerce found that "Hyundai sufficiently addressed the discrepancies in

sequencing of certain of its documents for certain U.S. sales," and that it has "no

remaining questions as to the reliability of Hyundai's reporting of U.S. sales." *Id.* at 18-

19.  No party challenges these findings before the court, and Hyundai requests that

these findings be affirmed.  *See generally* Def.-Ints.' Comments in Supp. of the Final

Results of Redetermination Pursuant to Court Remand, ECF No. 117.  On remand,

Commerce addressed the sequencing issues it was required to address and, in the

absence of any further challenge to the agency's determination in that regard, the court

will sustain Commerce's redetermination findings on the issue of Hyundai's document

sequencing, including its decision not to apply facts available or AFA.[4]

## II. Hyundai and Hyosung's U.S. Commission Expenses

In briefing its original motion to the court, ABB had argued that Commerce erred

in granting Hyundai and Hyosung a home market commission offset related to

commissions on sales made in the United States.  Pl.'s Mem. at 47-52; *see also ABB I*,

190 F. Supp. 3d at 1182.  In *ABB I*, the court ruled that Commerce had not adequately

explained its treatment of respondents' commissions and remanded the issue for further

clarification.  190 F. Supp. 3d at 1182-84.

In its redetermination, Commerce concluded that Hyosung and Hyundai's U.S.

commissions were incurred in the United States and that there were no commission

expenses in the home market.  Remand Results at 39.  Commerce determined that

these U.S. commission expenses should be treated as CEP selling expenses and

deducted from the U.S. sales price along with the allocated profit.  *Id.*  Additionally,

Commerce did not grant a commission offset to normal value (or "NV").  *See id*. at 32.

Hyosung challenges Commerce's redetermination, arguing that the agency went

---

[4] In *ABB I*, the court had deferred ruling on the issue of whether Commerce should have applied facts available or AFA in calculating Hyundai's dumping margin because of the discrepancies in the sequencing of Hyundai's documents.  190 F. Supp. 3d at 1182.  In its remand redetermination, Commerce addressed the issue of sequencing.  Remand Results at 7-22.  Subsequently, ABB filed comments regarding the redetermination and no longer challenges the sequencing of Hyundai's documents.  *See generally* ABB's Comments in Supp.  As such, the court need not further address Commerce's determination not to apply facts available or AFA in connection with the sequencing issue.

beyond the court's remand instructions when it revised its factual findings on where

Hyosung's commissions were incurred and that its new, three-step methodology for

determining where commissions are incurred is "results-oriented" and contradicts its

previous position.  Hyosung's Comments in Opp'n at 1-3.  Hyundai also challenges

Commerce's redetermination, arguing that "den[ying the] commission offset based on

where the commission was 'incurred'" is contrary to the governing statute and

regulations.  *See* Hyundai's Comments in Opp'n. at 3-6.

    Defendant responds that Hyundai and Hyosung fail to establish that Commerce

lacked legal or factual support for its treatment of their commissions and that their

challenge to Commerce's factual findings on where the commissions were incurred also

fails.  Def.'s Resp. to Def.-Ints.' Comments Regarding Final Results of Redetermination

("Def.'s Resp.") at 5-9, ECF No. 114.  ABB argues that Commerce complied with the

court's remand instructions, and that its treatment of respondents' U.S. commissions

conforms to statutory requirements.  ABB's Comments in Supp. at 2-9.

    As an initial matter, in its prior opinion, the court remanded the U.S. commission

issue to Commerce "to further explain its treatment of the respondents' U.S.

commissions, the record basis for such treatment, whether such U.S. commissions

result in the granting of commission offsets, and the legal and factual basis for the

granting or denial of the commission offsets…"  *ABB I*, 190 F. 3d at 1184.  The court did

not seek to constrain the agency's reconsideration of its treatment of U.S. commissions.

Consequently, Hyosung's claim that Commerce exceeded the court's remand

instructions is inapposite.  The court now turns to the merits of respondents' remaining arguments.

### A. Overview of Commerce's Interpretation of the Law

In its redetermination, Commerce explained its approach to analyzing and adjusting for commission expenses associated with U.S. sales.[5]  Remand Results at 28-31.  When a commission expense is incurred in the United States, an adjustment is made to the price used to establish constructed export price pursuant to 19 U.S.C. § 1677a(d)(1) and 19 C.F.R. § 351.402(b), and for profit allocated to that commission expense pursuant to 19 U.S.C. § 1677a(d)(3).  *See id.* at 28, 30 n.136.  Once the U.S. commission is deducted from the price used to establish the constructed export price, there is no resulting adjustment to normal value unless otherwise justified based on a difference in the level of trade, either as a level of trade adjustment or a CEP offset. [6]

---

[5] The court sought to distill the agency's approach and articulated it in questions posed to the parties prior to oral argument on the Remand Results.  Confidential Letter from the Court to all Parties, ECF No. 122.  All parties agreed that the court had accurately summarized the agency's reasoning.  The court will uphold Commerce's determination when the path to that determination is reasonably discernable from the determination itself.  *See NMB Singapore Ltd. v. United States,* 557 F. 3d 1316, 1319 (Fed. Cir. 2009) ("Commerce must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court.") (citations omitted).  Here, Commerce's path to its determination is reasonably discernable from the determination itself; accordingly, the court sustains Commerce's approach.

[6] Commerce granted a CEP offset to both Hyosung and Hyundai in order to account for differences in levels of trade between the constructed export price sales and normal value sales respectively.  Analysis of Data Submitted by Hyosung Corp. in the Prelim. Results of the 2012-2013 Admin. Review of the Antidumping Duty Order on Large Power Transformers from the Republic of Korea (Dep't Commerce Sept. 18, 2014) at 4-7, 16; CR 423; PR 209; ECF No. 82-3 (proprietary prelim. mem. for Hyosung accompanying the prelim. results); Analysis of Data Submitted by Hyundai Heavy Indus.

*See id.* at 31-32.  Commerce further explained that there is no basis for granting a home market commission offset for commissions incurred in the United States because "commissions incurred in the United States are not related to economic activities in the home market." *Id.* at 32.  On the other hand, when a commission expense is incurred outside the United States (on a sale to the United States), an upward or downward adjustment to normal value may be made pursuant to the circumstances of sale provision, 19 U.S.C. § 1677b(a)(6)(C)(iii) and 19 C.F.R. § 351.410(e). *Id.* at 29.  This includes the possibility of a commission offset if commissions are only incurred on sales to one market.[7]  *See id.*  Thus, commissions incurred outside the United States are not treated as CEP selling expenses.  *Id.*  Rather, Commerce "adds such commission expenses to normal value and offsets differences in home market commission expenses and such U.S. commission expenses incurred outside the United States, if any."  *Id.*

---

Co., Ltd., in the Prelim. Results of the 2012-2013 Admin. Review of the Antidumping Duty Order on Large Power Transformers from the Republic of Korea (Dep't Commerce Sept. 18, 2014) at 4-6, 13, CR 430; PR 211; ECF No. 82-4 (proprietary prelim. mem. for Hyundai accompanying the prelim. results); *see also Large Power Transformers from the Republic of Korea*, 79 Fed. Reg. 57,046 (Dep't Commerce Sept. 24, 2014) (prelim. results of antidumping duty admin. review; 2012-2013), CJA 27; PJA 27; PR 217; ECF No. 71-6, and accompanying Issues and Decision Mem., A-580-867 (Sept. 18, 2014), CJA 62; PJA 62; PR 208; ECF No. 71-15.

[7] "[T]he Secretary normally will make a reasonable allowance for other selling expenses if the Secretary makes a reasonable allowance for commissions in one of the markets under consideration, and no commission is paid in the other market under consideration," (i.e., the commission offset).  Remand Results at 28 (quoting 19 C.F.R. § 351.410(e).

**B. Commerce's methodology for adjusting for commissions incurred in the United States is in accordance with law**

In their comments on the redetermination, both Hyosung and Hyundai argue that the statute, regulations, and legislative history do not support the geographic distinction Commerce made when it declined to grant a home market commission offset for U.S. commissions incurred in the United States.  Hyosung's Comments in Opp'n at 4; Hyundai's Comments in Opp'n at 3.  Defendant disagrees and argues that the distinction Commerce made is supported by law.  Def.'s Resp. at 5-6.  For the reasons discussed below, Defendant's distinction between U.S. commissions that result in an adjustment in the determination of constructed export price and U.S. commissions that may, instead, result in a circumstance of sale adjustment or commission offset in the determination of normal value is in accordance with law.

This court must accord substantial weight to the agency's interpretation of the statute it administers.  *American Lamb Co. v. United States*, 785 F.2d 994, 1001 (Fed. Cir. 1986) (citations omitted).  "An agency's 'interpretation of the statute need not be the only reasonable interpretation or the one which the court views as the most reasonable.'" *ICC Indus., Inc. v. United States*, 812 F.2d 694, 699 (Fed. Cir. 1987) (emphasis omitted) (citation omitted).  When "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984) (footnote omitted).

Antidumping analysis requires Commerce to compare the export price (or "EP")

or constructed export price of the subject merchandise with the normal value of the

foreign like product.  19 U.S.C. § 1677b(a) (Commerce must make "a fair comparison . .

. between the export price or constructed export price and normal value" of the subject

merchandise.); *see also* 19 C.F.R. § 351.401(a) ("In general terms, an antidumping

analysis involves a comparison of export price or constructed export price in the United

States with normal value in the foreign market.").  Each of these terms, export price,

constructed export price, and normal value are defined by statute:

> The term "export price" means the price at which the subject merchandise
> is first sold (or agreed to be sold) before the date of importation by the
> producer or exporter of the subject merchandise outside of the United
> States to an unaffiliated purchaser in the United States or to an unaffiliated
> purchaser for exportation to the United States, as adjusted under
> subsection (c).

19 U.S.C. 1677a(a).

> The term "constructed export price" means the price at which the subject
> merchandise is first sold (or agreed to be sold) in the United States before
> or after the date of importation by or for the account of the producer or
> exporter of such merchandise or by a seller affiliated with the producer or
> exporter, to a purchaser not affiliated with the producer or exporter, *as
> adjusted* under subsections (c) *and (d)*.

19 U.S.C. § 1677a(b) (emphasis added).

> [Normal value typically is] the price at which the foreign like product is first
> sold . . . for consumption in the exporting country, in the usual commercial
> quantities and in the ordinary course of trade and, to the extent
> practicable, at the same level of trade as the export price or constructed
> export price.

19 U.S.C. § 1677b(a)(1)(B)(i).

While many differences between U.S. price (whether based on export price or constructed export price) and normal value are taken into account when the price comparison is made, in the case of constructed export price transactions, the statutory definition of that price requires certain adjustments be made at the outset, in order to determine the constructed export price, and without regard to the comparison with normal value.  *See* 19 U.S.C. 1677a(b).  One of those statutory adjustments is for commissions incurred in the United States.  *See* 19 U.S.C. § 1677a(d).  Pursuant to § 1677a(d)(1)(A), in order to arrive at the constructed export price, among other things, Commerce must deduct "commissions for selling the subject merchandise in the United States" from the starting price for constructed export price.[8]  *Id.* § 1677a(d)(1)(A).

Although § 1677a(d)(1)(A) does not contain a geographical distinction on where commissions must be incurred, its regulatory provision references commissions that are associated with commercial activity occurring in the United States, and provides that such commissions be treated as adjustments in the determination of constructed export price.  *See* 19 C.F.R. § 351.402(b).  Specifically, the implementing regulation, 19 C.F.R. § 351.402(b), explains:

> In establishing constructed export price under section 772(d) of the Act, [19 U.S.C. § 1677a(d),] the Secretary will make adjustments for expenses *associated with commercial activities in the United States* that relate to the sale to an unaffiliated purchaser, no matter where or when paid. The Secretary will not make an adjustment for any expense that is related solely to the sale to an affiliated importer in the United States, although the Secretary may make an adjustment to normal value for such expenses under section 773(a)(6)(C)(iii) of the Act.

---

[8] In contrast, "other differences in the circumstances of sale" provide a basis for an adjustment to normal value.  19 U.S.C. § 1677b(a)(6)(C)(iii).

19 C.F.R. § 351.402(b) (emphasis added).

The preamble to 19 C.F.R. § 351.402(b) further supports Commerce's

construction of § 1677a(d)(1)(A):

> The purpose [of adding a new sentence barring an adjustment to
> constructed export price for expenses related to sales to affiliated
> importers] is to *distinguish between selling expenses incurred on the sale
> to the unaffiliated customer, which may be deducted under [19 U.S.C. §
> 1677a](d)(1), and those associated with the sale to the affiliated customer
> in the United States, which may not be deducted* [pursuant to the same] . .
> . . [T]he reference to adjustments to normal value reflects our agreement .
> . . that the Secretary *may adjust for direct selling expenses (as well as
> assumed expenses) associated with the sale to the affiliated importer
> under the circumstance of sale provision* [pursuant to 19 U.S.C.
> § 1677b(a)(6)(C)(iii)].

62 Fed. Reg. 27,296, 27,351 (discussing 19 C.F.R. § 351.402) (emphasis added).

Some 20 years ago, when Commerce adopted 19 C.F.R. § 351.402, the agency

traced its rationale to the Statement of Administrative Action to the Uruguay Round

Agreements Act.  *See* Uruguay Round Agreements Act, Statement of Administrative

Action, H.R. Doc. No. 103-316, vol.1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040

("SAA");[9] *see also* Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296,

27,351 (Dep't of Commerce May 19, 1997) (final rule) ("the SAA makes clear that only

those expenses associated with economic activities in the United States should be

deducted from constructed export price.  In discussing [§1677a](d)(1), the SAA states

that the deduction of expenses in calculating constructed export price relates to

---

[9] The SAA is the authoritative interpretation of the statute.  19 U.S.C. § 3512(d); *RHP
Bearings Ltd. v. United States*, 288 F.3d 1334, 1345 n.7 (Fed. Cir. 2002).

'expenses (and profit) *associated with economic activities occurring in the United States*.'") (citing SAA at 823, *reprinted in* 1994 U.S.C.C.A.N. at 4164)).

The SAA explains the differences between the commissions incurred on U.S. sales in the United States (adjusted for in the CEP calculation) and commissions incurred on U.S. sales outside the United States by noting that

> [i]n constructed export price situations Commerce will deduct direct expenses incurred in the United States from the starting price in calculating the constructed export price.  However, *direct expenses and assumptions of expenses incurred in the foreign country on sales to the affiliated importer will form a part of the circumstances of sale adjustment*.

SAA at 828, *reprinted in* 1994 U.S.C.C.A.N. at 4167 (emphasis added).  In doing so, the SAA limits the circumstances of sale adjustment, including the home market commissions offset, to direct expenses and assumptions of expenses *incurred in the foreign country on sales to the affiliated importer* (such as with export price sales).  The SAA further provides that

> [19 U.S.C. § 1677b](a)(6)(C)] [] authorizes Commerce to adjust normal value to account for other differences . . . between export price (or constructed export price) and normal value that are wholly or partly due to differences in quantities, physical characteristics, or other differences in the circumstances of sale.  *With respect to each of these adjustments, as well as all other adjustments, Commerce will ensure that there is no overlap or double-counting of adjustments*.

SAA at 828, *reprinted in* 1994 U.S.C.C.A.N. at 4167 (emphasis added).[10]

---

[10] Notably, in the remand redetermination, Commerce explained that "[b]ecause commissions incurred in the United States are not related to economic activities in the home market, there is no basis for granting a home market commission offset." Remand Results at 32.  Commerce stated that "pursuant to section B.2.b.(2) of the SAA [*see* SAA at 823-25 regarding adjustments to export price and constructed export price]

Both Hyosung and Hyundai base their argument on 19 C.F.R. § 351.401(e). Hyosung's Comments in Opp'n at 5; Hyundai's Comments in Opp'n at 5-6.  They argue that this regulation states that Commerce will provide a commission offset when commissions are paid in one market and not the other, and that the U.S. commission does not need to be categorized as either a payment eligible for a commission offset or a CEP expense – it can be both.  Hyosung's Comments in Opp'n at 5; *see also* Hyundai's Comments in Opp'n at 3-6.

Defendant responds that the "SAA's instruction to deduct from constructed export price only commissions that are 'incurred in the United States'" means that Commerce's decision to deny a home market commission offset for commission expenses incurred in the United States is a "reasonabl[e] interpretation" of §1677b(a)(6)(C)(iii) and 19 C.F.R. § 351.410(e).  Def.'s Resp. at 6-7.  ABB argues that 19 C.F.R. § 351.410(e) implements §1677b(a)(6)(C)(iii), and as such, the regulation is "limited to offsetting direct expenses, including commissions, incurred in the foreign country on [constructed export price] sales."  ABB's Comments in Supp. at 5.  According to ABB, this is the only interpretation that harmonizes §§ 1677a and 1677b.  *Id.* at 4-5 (citing § 1677b(a)(6)(C)(iii), 19 C.F.R. § 351.410(e), and the SAA at 828, *reprinted in* 1994 U.S.C.C.A.N. at 4167).

Respondents are mistaken in their interpretation of the relevant statutory and regulatory provisions.  The commissions in question are incurred in the United States on

---

and 19 C.F.R. § 351.410(e)," when "there are no home market commissions incurred, a commission offset is granted only when U.S. commission expenses are incurred outside the United States to offset the expenses related to the selling activities in the home market for the matching home market sales."  *Id.* at 36.

constructed export price sales.  However, instead of relying on the statutory provision

that governs constructed export price calculation, the regulation implementing that

provision, and its legislative history, as outlined above, respondents seek an adjustment

under the provisions for calculating normal value.  Specifically, the commission offset

that they seek (and which is contemplated by 19 C.F.R. § 351.410(e)) occurs pursuant

to the circumstance of sale adjustment to normal value provided for in 19 U.S.C.

§ 1677b(a)(6)(C)(iii).  In the redetermination, Commerce correctly stated that

§ 1677b(a)(6)(C)(iii), the statutory basis for 19 C.F.R. § 351.410(e), requires the agency

"to make adjustments to normal value based on *other* differences in the circumstances

of sale."  Remand Results at 36 (emphasis added).  Commerce acknowledged that the

statute and regulation do not explicitly discuss a geographic distinction for adjusting for

U.S. commissions; however, Commerce concluded that its practice of denying

commission offsets when the U.S. commission is incurred inside the United States is

consistent with the language of the statute as well as relevant sections of the SAA.  *Id.*

at 37.

Respondents' arguments to the contrary are of no moment.  In particular,

Hyosung argues that *Federal Mogul Corp. v. United States*, 18 CIT 785, 798, 862 F.

Supp. 384, 397-98 (1994) found that 19 C.F.R. § 353.56(b) allowed for an adjustment to

normal value when commissions are paid on U.S. sales but not on home market sales.

Hyosung's Comments in Opp'n at 5-6.  However, *Federal Mogul* is inapposite because

it was decided on the basis of the pre-Uruguay Round Agreements Act ("URAA") statute

and there have been important statutory changes since then.  *See Federal Mogul*, 18

CIT at 797-98.  Moreover, to the extent there are analogous provisions between the two

versions of the statute, and the regulations based thereon, that court explained that

commission adjustments were governed by 19 C.F.R. § 353.56(b), which allowed for an

adjustment to "foreign market value" (changed to "normal value" in the URAA) when

commissions are paid in one market but not the other; however, subsection (b)(2)

expressly distinguishes "export sales price" (changed to "constructed export price" in the

URAA) situations and excluded adjustments for, among other things, U.S. commissions

in exporter's sales price comparisons.[11]  Consequently, *Federal Mogul* is unavailing.

Hyundai argues that Commerce "incorrectly conflated the relevance of where

U.S. commissions are incurred to the decision of whether they should be subtracted

from U.S. price or added to normal value with the completely separate decision of the

amount of a commission offset to normal value."  Hyundai's Comments in Opp'n at 3.

Specifically, Hyundai argues that the circumstances of sale adjustment to normal value

is not conditioned on where expenses were incurred.  *Id.* at 5.[12]  However, as noted in

the court's discussion of the legal framework (above), this is not the case.

---

[11] While the URAA ushered in many substantive changes intended to conform U.S. law
to the various World Trade Organization ("WTO") agreements, statutory changes were
also made to conform some terms of art to the terms used in WTO agreements.  SAA at
820, *reprinted in* 1994 U.S.C.C.A.N. at 4161.

[12] Defendant responds that while the regulations do not contain a geographic distinction,
Commerce's interpretation of the regulation is a reasonable one.  Defendant asserts
that §1677a(d)(1)(A) and the SAA, read together, provide for a CEP deduction only if
the commission is incurred in the United States and §1677b(a)(6)(C)(iii) and 19 C.F.R.
§ 351.410(e), read together, account for U.S. commission expenses incurred outside
the United States by allowing adjustments to normal value.  Def.'s Resp. at 5-6.

Hyundai further argues that § 1677a(d)(1) requires Commerce to reduce constructed export price by the amount "generally incurred . . . for the affiliated seller in the United States" and that § 1677a(d)(1)(A) requires that commissions be incurred "for selling the subject merchandise in the United States," but does not specify where the commissions have to be incurred.  Hyundai's Comments in Opp'n at 4-5 (emphasis added).  However, the SAA supports Commerce's decision to "deduct commissions from constructed export price, but only to the extent that they are incurred in the United States on sales of the subject merchandise," SAA at 823, *reprinted in* 1994 U.S.C.C.A.N. at 4164, and, as discussed below, Hyundai's challenge to the factual finding that the commissions were incurred in the United States also fails.

Finally, Hyundai asserts that 19 C.F.R. § 351.410(e) provides for a commission offset if a commission is granted in one market and not the other and the statute is clear in "defin[ing] both (1) when a commission offset should be made, and (2) the amount of the offset that should be made."  Huyndai's Comments in Opp'n. at 5-6.  Hyundai contends that the treatment of commissions is not predicated on where they were incurred.  *Id.* at 6.  Here, Hyundai is reading the regulation in isolation.  The regulation addresses the circumstances of sale adjustment to normal value and, within that context, the court has already discussed Commerce's treatment of the commissions and the relationship between where the commissions are incurred and whether a home market commission offset is granted as set forth in the statute, the SAA, and the regulations.  Hyundai's argument therefore fails.

### C. Commerce's methodology for determining where respondents' commissions were incurred is in accordance with law

The statute, regulations, and SAA provide Commerce with a legal basis to distinguish between commissions incurred in the United States and those incurred outside the United States for U.S. sales. *See supra* Section II.A. In the absence of statutory criteria to apply, Commerce may develop or refine reasonable criteria to determine where commissions on U.S. sales are incurred. *See, e.g.*, *U.S. Steel Corp. v. U.S.*, 34 C.I.T. 252, 257, 712 F. Supp. 2d 1330, 1337 (2010) (Commerce has broad discretion to develop methodology to implement a statue provided that methodology is reasonable). While Commerce had previously deducted commissions incurred in the United States from the starting price used to arrive at the adjusted constructed export price, Commerce had not articulated the factors that it relied upon to determine where the commissions were incurred.

In the remand redetermination, Commerce articulated three, non-exhaustive factors to determine the location of economic activity and where the commissions were incurred. Remand Results at 40. Specifically, Commerce stated that

> [t]o determine the scope of economic activities with regard to the commission expenses which occurred in the United States, we considered the following non-exhaustive factors: (1) where sales agents are located at the time of the commission agreement; (2) where and by what entity the corresponding commission payments were booked or made; and (3) when the commission payments were made during the normal course of business.

*Id.* Respondents now challenge Commerce's methodology.[13]

---

[13] Respondents' arguments rest largely on challenging Commerce's legal interpretation of the statutes and regulatory provisions at issue rather than the test itself. In fact,

Hyosung argues that Commerce's "three-factor test" is new, "unnecessarily broad," and "defies the agency's own previous reasonable interpretation of the facts [in this case], and, more importantly, the commercial reality with respect to the merchandise subject to this proceeding."  Hyosung's Comments in Opp'n at 2-3. Hyosung further argues that the fact that Commerce articulated a test "underscores" its position that "Commerce's interpretation of the CEP expense and commission offset regulations is not a matter of settled agency practice."  *Id.* at 7.  Although Hyosung contends that Commerce's citations showing its practice are limited to two cases and that such a small number of citations indicates that the practice is new, Hyosung itself provides no support for its position that "Commerce has consistently applied a commission offset [when] commissions were paid in one market but not the other."  *Id.* at 8.

Hyosung also takes issue with Commerce's reliance on its internal computer programming notes for the margin calculation, arguing that the calculation is

---

Hyosung and Hyundai did not challenge Commerce's factual findings in their briefs to the court.  *See generally* Hyosung's Comments in Opp'n; Hyundai's Comments in Opp'n.  At oral argument, however, Hyundai called into question Commerce's review of the record documents. Hyundai did not raise these arguments in its briefs to the court; as such, they are waived.  *See, e.g.*, *United States v. Great American Ins. Co.,* 738 F.3d 1320, 1328 (Fed. Cir. 2013) (stating that "[i]t is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived."); *SmithKline Beecham Corp. v. Apotex Corp.,* 439 F.3d 1312, 1319–20 (Fed. Cir. 2006) (explaining that "[the] law is well established that arguments not raised in the opening brief are waived").  Although the court retains discretion to consider improperly raised arguments when "circumstances indicate that it would result in basically unfair procedure," *Becton Dickinson and Co. v. C.R. Bard, Inc.,* 922 F.2d 792, 800 (Fed. Cir. 1990), the court declines to exercise that discretion here because the circumstances do not support it.

inconsistent with the regulations and that the computer program itself changed between the time of the July 2012 investigation and the first administrative review, suggesting again that Commerce's approach is new.  *Id.* at 8-9.  As Hyosung itself acknowledges, the relevant question is not whether "Commerce followed its standard calculation program, but rather, whether the agency's calculations and treatment of commission expenses is consistent with the regulations."  *Id.* at 9.  While it is true that Commerce devoted a significant portion of its remand redetermination to discussing the margin program notes, the margin calculation programming notes constitute neither substantial evidence nor legal authority.  Nevertheless, Commerce sufficiently addressed the legal and statutory basis for its treatment of respondents' U.S. commissions and, as discussed above, that treatment was in accordance with law.[14]  *See supra* Section II.A.

_____

[14] Hyosung also argues that Commerce's remand redetermination did not comply with the court's remand instructions because the court had not "take[n] issue with Commerce's factual finding on the [] record," and because Commerce's remand "interpreted the [c]ourt's narrow remand instruction to explain Commerce's findings as an invitation to change its methodology."  Hyosung's Comments in Opp'n at 2.  As noted above, the court's remand order instructed Commerce to consider the legal and factual basis of its treatment of respondents' commissions and did not expressly limit the scope of Commerce's remand.  As such, Commerce acted consistently with the court's remand instructions when it considered the legal basis for its treatment of respondents' U.S. commissions and articulated the factors it considered when evaluating where respondents' U.S. commissions were incurred.  Unless specifically directed by the court, Commerce has broad discretion to fully consider the issues remanded.  *See Laclede Steel Co. v. United States*, 19 CIT 1076, 1078 (1995) ("Any decision to expand the administrative record upon remand is well within [Commerce's] discretion, absent express language from the court barring such action."); *Elkton Sparkler Co. v. U.S. Dep't of Commerce*, 17 CIT 344, 346 (1993) (Commerce did not exceed scope of remand order by investigating certain factor information in the remand proceeding when plaintiff had raised the issue in its complaint).

Hyundai contends that Commerce's three-factor test is inconsistent with the

statute and regulations.  Hyundai's Comments in Opp'n at 7.  Hyundai argues that this

three-factor test will "likely lead to the conclusion that all commissions are incurred in

the United States."  *Id.* at 8.  Finally, Hyundai alleges that Commerce's new test is made

up of factors recommended by the Plaintiff in its pleading before this court regarding the

second administrative review of the same antidumping duty order.[15]  *Id.* at 7.  Hyundai's

assertion that Commerce's factors will always lead to a finding that the commission was

incurred in the United States is conclusory, and Hyundai did not articulate a scenario in

which such a result would be clearly unreasonable.  Because the factors, when properly

applied to respondents' facts, lead to a reasonable result, and Hyundai failed to

establish that the test itself is unreasonable, Hyundai's argument must fail.  Also, if the

factors themselves are reasonable, the objection that they may have been proposed by

Plaintiff, with nothing more, is insufficient to call them into question.  As noted above,

Commerce has discretion to fashion, develop, or refine criteria that enable it to

administer the statute, so long as its criteria are in accordance with the statute.  Thus,

Hyundai's arguments fail to persuade the court that Commerce has acted

impermissibly.

---

[15] At oral argument, Hyundai argued that Commerce should have taken into
consideration where the commission was paid rather than where it was incurred
because the overall purpose is to delineate profit, which is based not just on where the
sale or commission actually occurs but also on who bears the risk for the sale.  Hyundai
made this argument for the first time at oral argument and did not raise this issue in its
brief to the court.  As such, it has waived the argument.  Moreover, Commerce's
consideration of where commissions were incurred is based on a reasonable
interpretation of the relevant statutory provisions.

As the agency tasked with administering the antidumping and countervailing duty provisions of the statute, Commerce has broad authority to determine the criteria by which it will evaluate issues within an investigation or administrative review, provided the criteria are consistent with the statute and regulations.  As discussed above, Commerce's treatment of U.S. commissions is in accordance with the relevant legal framework.  To the extent that Commerce had to develop and articulate a test to implement the statute, the court's review is limited to determining "whether the agency's [action] is based on a permissible construction of the statute."  *Dominion Res., Inc. v. United States*, 681 F.3d 1313, 1317 (Fed. Cir. 2012) (citing *Chevron*, 467 U.S. at 842-43).  Neither respondent has shown the court that Commerce's treatment of respondents' U.S. commissions was based on an impermissible construction of the statute, *see supra* Section II.B, and having determined that the statute and regulations support the geographic distinction, Commerce acted within its authority to articulate a non-exhaustive list of factors to help it determine where commissions were incurred. Since respondents were not able to show the court why Commerce's use of these factors was unreasonable, there is no reason for the court to disturb Commerce's determination.

## CONCLUSION

In accordance with the foregoing, the court sustains Commerce's remand redetermination on the issue of the sequencing of certain of Hyundai's documents. Further, the court sustains Commerce's remand redetermination on the issue of its treatment of respondents' commissions.

Court No. 15-00108                                                    Page 25

It is so **ORDERED**.  Judgment will enter accordingly.


/s/      Mark A. Barnett
Mark A. Barnett, Judge

Dated: October 10, 2017
New York, New York